**Todd ESSE, Brent Esse, and 5E Oil and Gas Corporation, Appellants,**

v.

**EMPIRE ENERGY III, LTD., BP American Production Company, and Kenneth Havis, Trustee in Liquidation for Westgate Energy Partners, Inc., Appellees.**

No. 01–08–00854–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 22, 2010.

Rehearing Overruled Sept. 2, 2010.

Rehearing En Banc Overruled Nov. 23, 2010.

---

Robert L. Galloway, Robert L. Galloway, P.C., Houston, TX, for Appellants.

Andrew Howard Petty, Petty & Petty, L.L.P., Chris DiFerrante, Chris DiFerrante Attorney At Law, Houston, TX, for Appellees.

Panel consists of Justices KEYES, HIGLEY, and WILSON.*

## OPINION

EVELYN V. KEYES, Justice.

Appellants, Brent and Todd Esse and 5E Oil and Gas Corporation (collectively the Esses), appeal the trial court's July 15, 2008 judgment against them in the breach of contract action filed by appellees, Empire Energy III, Ltd. (Empire), BP American Production Company (BP), and Kenneth Havis as the trustee in liquidation for Westgate Energy Partners, Inc. (Westgate). In five issues, the Esses argue that the trial court erred in: (1) concluding that Todd and Brent Esse had the specific malicious intent necessary for liability under fraudulent transfer, conspiracy, breach of fiduciary duty, or usurpation theories; (2) holding Todd and Brent Esse personally responsible for damages under the fraudulent transfer theory; (3) finding that Todd and Brent Esse usurped corporate opportunities by forming another corporation to do what Westgate could not; (4) finding that 5E was Westgate's alter ego; and (5) requiring Todd and Brent Esse to pay the Trustee's attorney's fees. The Esses also filed separate briefing addressing the trial court's June 5, 2009 Judgment Nunc Pro Tunc, arguing that judgment is void as a matter of law because the trial court

* The Honorable Davie Wilson, retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

lacked plenary power and jurisdiction to change anything other than clerical mistakes in the July 15, 2008 judgment and the requested changes did not address a clerical error.

We affirm.

## Background

On March 1, 2002, BP and Empire[1] entered into a joint operating agreement (JOA) in which each company had a 50% working interest in certain energy exploration and production endeavors, particularly in a prospect known as the Preston 811 # 1 Well, in Yoakum County, Texas (Preston well). BP was designated as the operator. Article VII, Section B, of the BP–Empire contract grants BP a security interest in Empire's and any of its assignees' shares of the Preston well assets, allowing BP to recover operating costs upon payment defaults by Empire or Westgate:

> Each Non–Operator grants to [BP] a lien upon its oil and gas rights in the [Preston well], and a security interest in its share of oil and/or gas when extracted and its interest in all equipment to secure payment of its share of expense. . . . [U]pon default by any Non–Operator in the payment of its share of expense, [BP] shall have the right . . . to collect from the purchaser the proceeds from the sale of such Non–Operator's share of oil and/or gas until the amount owed by such Non–Operator, plus interest, has been paid. The non-defaulting parties, including [BP] shall . . . pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

Empire then contacted Daniel Boone, a petroleum engineer who knew Empire principal Dennis Ferstler, to express its desire to sell half of its interest in the Preston well. Boone had also had previous business relations with Todd Esse,[2] and Boone informed the Esses of Empire's interest in selling part of its interest in the well. After consulting with Boone, the Esses incorporated Westgate on March 21, 2002 as an "S" corporation, with Brent and Todd each owning half the shares. Brent subsequently distributed a portion of his shares to his four children, making Todd the majority shareholder. Todd was also a significant source of Westgate's capital. Brent was an officer and director of Westgate, and he was the only other source of Westgate's capital. Around the same time, Westgate also acquired interests in another property known as the Fitzgerald/Mallet Prospect.

Prior to the commencement of drilling on the Preston Well, Boone and Brent Esse attended an operator's meeting at BP. Boone signed a Data Secrecy Agreement in which he agreed, among other things, that "[he] shall be solely responsible for any actions which [he] takes, or advises others to take, in reliance upon Information furnished by BP," that BP

---

1. Apparently an entity related to Empire III, also identified as Empire in the pleadings, originally entered into the deal with BP and subsequently transferred half of its interest to Westgate. Immediately after Empire transferred half of its interest to Westgate, it assigned its remaining interest to Empire III. We refer to this corporation simply as "Empire" for the sake of clarity.

2. Boone and his company, Image Energy, borrowed $100,000 from Todd Esse in 2001, a debt that remained outstanding throughout the events that form the basis of this suit. After BP and Empire filed suit against Westgate and the Esses, Todd Esse forgave the interest on this loan.

made no warranties with respect to the information or subject matter of the operator's meeting, and that none of the disclosed information "is or shall be relied upon as a promise or representation or warranty, whether as to past, present or future." Brent Esse maintains that during this meeting BP assured him that it would not use "slick water"[3] in its operations of the well. However, none of the written agreements contain any provisions or agreements regarding the use of slick water.[4]

BP provided Westgate with an Authority for Expenditure that estimated the costs to drill and equip the Preston well at $749,700. In May 2002, Empire conveyed half of its interest to Westgate, thus giving Westgate a 25% working interest in the well, retaining a 25% interest for itself, and leaving BP as owner of the other 50% interest. The assignment from Empire to Westgate expressly provided that Westgate was bound by the terms of the original JOA, including the provision that BP would function as the operator and the provisions that non-defaulting parties could be called upon by the operator to pay any unpaid amounts owed by a defaulting party in the proportion of their interest. Westgate also agreed "to pay its proportionate share of all costs, including but not limited to, the costs of leases ... and drilling, evaluation, completion, testing and equipping" the Preston well and to "protect, defend, indemnify and hold [Empire] harmless from all claims, damages, expenses or other costs incurred as a result of the claims or judgments arising as a

result of [Westgate's] ownership or operation of the Properties assigned...." Pursuant to this agreement, Westgate paid a $20,000 "promotional fee" to Empire and paid an additional $13,000 to Empire, representing 25% of the operating cost already incurred in acquiring the Preston lease. BP was not a party to this agreement between Empire and Westgate.

Starting in May 2002, as operations at the well progressed, BP sent monthly Joint Interest Billings to Westgate and Empire detailing the expenses and invoicing their share of the costs. In a June 24, 2002 Operating Agreement, Westgate and Empire both elected in writing to participate in the completion of the well, obligating Westgate to pay an additional $59,375 for its portion of the completion costs. Following the election to complete the Preston well, Westgate continued to receive billings from BP. Westgate never paid any money pursuant to these statements. At no time did Westgate ever have capital in excess of $69,063.

Upon its completion, the well never produced significant amounts of oil and, by the end of 2002, the parties involved realized that production from the well would not compensate for the drilling costs anytime in the near future. Westgate subsequently refused to pay its share of the costs for the Preston well, arguing that the Esses and Boone had been misled by BP about the use of slick water, which they alleged was a breach of contract.

3. Slick water is a water base fluid with a gel polymer added to give a friction reduction benefit. Appellants contend that this polymer additive can affect the permeability of certain underground formations, making it more difficult for oil or gas to reach the wellhead.

4. BP and Empire contest that any agreement was ever made, and, to the extent that they did discuss the use of slick water, BP stated only that it would refrain from using slick water during the drilling phase of well operations. The evidence introduced at trial indicated that slick water was used during the completion phase of the well and not during the drilling phase.

In late 2002, BP billed Westgate for its share of the costs associated with the well, and Westgate refused to pay. In January 2003, BP billed Empire under their operating agreement for one-third of Westgate's portion of the dry hole costs, and BP bore the remaining two-thirds of Westgate's portion of the dry hole costs. BP and Empire made phone calls and numerous other demands for payment from Westgate.

On December 11, 2002, Westgate offered to buy BP out of its interests in the Preston well and another nearby well, the Nelson well, for $30,000 total, rather than paying its share of the Preston well costs. However, in a January 14, 2003 letter, BP rejected Westgate's buyout offer and insisted that Westgate pay its share of expenses, estimated at $130,408.93.

On January 3, 2003, Westgate paid Boone $10,000 for consultation Boone had done in March 2002 regarding the Mallet prospect. Westgate described this payment as an expense reimbursement, a prospect development fee and a fee for engineering supervision that was part of an oral agreement it had entered into with Boone in the summer of 2002.

On January 14, 2003, BP sent a letter to Brent Esse at Westgate demanding that Westgate pay its share of the Preston well costs and threatening to "pursue any and all other remedies" if it did not.

On January 28, 2003, Brent Esse consulted with the law firm Hughes, Watters & Askanase (HWA) about how to protect the Mallet prospect from Westgate's creditors and about how to put Westgate in bankruptcy once Mallet was transferred. The law firm identified Brent Esse as its client and identified Westgate as an adverse party.

On January 30, 2003 and over the next few days, Brent Esse and a partner at HWA discussed "structuring of ownership of new oil and gas investments," and the partner did work regarding "making an assignment of an oil and gas lease" and "asset transfer issues." On February 12, 2003, HWA advised Brent Esse on the transfer of the Mallet prospect.

During interactions with BP and Empire in February 2003, the law firm identified itself as Westgate's lawyer, and Westgate paid the bills sent by the law firm from March 2003 until March 2004. After March 2004, when Westgate's funds were exhausted, Todd Esse began paying the law firm's bills.

On February 13, 2003, the Esses formed Esse Oil & Gas Corp., which was later renamed 5E Oil and Gas. 5E was in most ways identical to Westgate—it was formed for the same business purpose of oil and gas development, Todd and Brent Esse were the only source of capital, it was owned by the same parties, and the incorporation document listed the same address, phone number, president, and tax structure. It also employed the same consultant as Westgate.

On February 19, 2003, Westgate transferred its interests in the Mallet prospect to 5E in exchange for a payment of $37,715. The money 5E paid to Westgate for the Mallet prospect was used by Westgate to pay the legal expenses billed by the law firm.

On September 11, 2003, BP filed suit against Westgate, Brent Esse, and Todd Esse seeking a declaratory judgment of the rights and obligations of the parties under the Preston well JOA and alleging claims for breach of contract, piercing the corporate veil and alter ego, fraud, punitive damages, and attorney's fees. BP eventually added causes of action alleging conspiracy and fraudulent transfer.

On October 14, 2004, Westgate filed for chapter 7 bankruptcy. The bankruptcy court appointed Havis as trustee of the bankruptcy estate. Subsequently, Empire and Havis joined BP's suit against Westgate, Brent Esse, Todd Esse, and 5E. BP, Empire, and Havis as Westgate's trustee all employed the same counsel. Havis, as Westgate's bankruptcy trustee, moved to nonsuit Westgate's counterclaim against BP, and on December 21, 2006, the trial court dismissed Westgate's breach of contract counterclaim against BP.

The remaining claims were tried in a bench trial in February 2008. Regarding BP and Empire's causes of action, the trial court concluded that Westgate was liable for breach of contract and fraudulent transfer, that Brent Esse and Todd Esse were both liable for fraudulent transfer and conspiracy to commit fraudulent transfer; and that 5E was liable "as if it were the alter ego of Westgate" for fraudulent transfer and conspiracy to commit fraudulent transfer. Regarding Westgate's and Havis's causes of action against the Esses and 5E, the trial court concluded that Brent Esse and Todd Esse were both liable for breach of fiduciary duty/self dealing and for usurping corporate authority and that 5E was also liable for fraudulent transfer and conspiracy to commit fraudulent transfer and for conspiracy to breach fiduciary duties owed to Westgate by Brent Esse and Todd Esse.

The trial court also found that:

- Brent Esse was the controlling shareholder and only director of Westgate, in addition to being its president and only employee.
- Todd Esse was only a shareholder in Westgate, nothing more.
- Prior to entering into the agreement with Westgate, BP and Empire performed absolutely no due diligence with respect to the financial viability or abilities of Westgate and sought no personal guaranties from the Esses.
- Westgate never had more than $70,000 in capital while it was doing business.
- Westgate made payments of $20,000 and $13,640 pursuant to its agreement with Empire prior to the execution of the agreements.
- Westgate failed to pay any of the costs to drill, complete, test, equip, and operate the Preston well after its initial payments of $33,640 despite demands for such payment from both BP and Empire.
- 5E was incorporated by the Esses on February 19, 2003, only after they had received demands from Plaintiffs for payment of the costs to drill and complete the Preston well in January of 2003.
- The decision to incorporate 5E was made by Brent and Todd Esse and benefitted them personally.
- The Mallet prospect was transferred by Westgate to 5E on February 19, 2003 for $37,715.
- The transfer of the Mallet prospect was made after the Esses had received, on Westgate's behalf, demands from BP for payment of over $200,000 in costs from the Preston well that Westgate had not previously paid.
- Ferstler, a principal of Empire, testified that the Mallet Prospect should have been valued at approximately $80,000, and Boone, the Esses' petroleum engineer, testified that the interest should have been valued at approximately $78,000. Thus, the value received by Westgate for the Mallet prospect "was less than half of the actual value" of the interest.
- The Mallet prospect "was transferred only to hinder or delay Westgate's creditors or to put the [Mallet pros-

pect] beyond the reach of Westgate's creditors."

- On January 3, 2003, Westgate paid Boone $10,000 "for what was described at trial as engineering work" on the Mallet prospect.
- Westgate had previously paid Boone nothing for any of the previous work he had done on the Preston well or the Mallet prospect, and the work for which he was paid the $10,000 had been done more than nine months before the payment was made.
- By the date of the payment to Boone, the Preston well "had been completed and in operation long enough for Boone and the Esses to become dissatisfied with the production from the well."
- The payment to Boone "did not return any reasonably equivalent value to Westgate because the payment was for work done on an asset Westgate would not soon own and would never reap the benefit of."
- The $10,000 payment to Boone was a fraudulent transfer.
- HWA was paid $35,597.75 from Westgate's operating account from March 2003 through March 2004.
- The source of the funds Westgate used to pay HWA was the proceeds of the sale of the Mallet prospect to 5E.
- Between March 2003 and March 2004, HWA was "simultaneously representing Westgate, Brent and Todd Esse individually, Daniel Boone individually, 5E, and another entity owned by Boone."
- HWA sent only one invoice, addressed to Brent Esse, every month for its services rendered in connection with Empire and BP's demands for payment, and none of the invoices "differentiated services or charges rendered on behalf of Westgate as opposed to

services or charges rendered on behalf of Brent and Todd Esse individually, Daniel Boone individually, 5E and another entity."

- "From the inception of their representation of Westgate, HWA acknowledged that Westgate was either an actual or potential adverse party to Brent Esse."
- "Most of the services rendered by HWA ... through the end of February 2004 ... were for the sole benefit of their clients other than Westgate."
- There was no determination or votes by the board of directors or shareholders of Westgate to indemnify either Brent or Todd Esse, and the Esses never affirmatively pled indemnification as an affirmative defense to fraudulent transfer.
- Westgate did not receive reasonably equivalent value for $26,465 of the attorney's fees it paid to HWA because the services provided did not directly or indirectly benefit Westgate.
- "BP and Empire's claims against Westgate arose before the transfer of the [Mallet prospect] to 5E was made, before the $10,000 payment from Westgate to Boone was made, and before Westgate issued any checks to HWA."
- These three transfers "were, taken together, substantially all of Westgate's assets" and Westgate was made insolvent by these transfers.
- "5E, Boone, and HWA were 'insiders,' as that term is defined in [Texas Business and Commerce Code section] 24.002(7), as to Westgate on the date of the transfers."
- "Brent and Todd Esse assented to and benefited from these transfers" and knowingly participated in the wrongdoing.

The trial court's final judgment, signed on July 15, 2008, awarded BP and Empire $224,158 from Westgate in contract damages. Specifically, it "ORDERED that Plaintiffs BP American Production and Empire Energy, III, Ltd. have and recover from Defendants Westgate Energy Partners $224,158.00 representing amounts owed under the contract between Empire and Westgate and the Court's finding of alter ego." The trial court also awarded pre-judgment interest on this amount. The trial court also awarded Westgate and Kenneth Havis $76,750 from Brent, Todd, and 5E "representing amounts owed for fraudulent transfer of assets," together with pre-judgment interest.

Regarding attorney's fees, the trial court's final judgment provided:

[It is] ORDERED that Westgate and Havis have and recover from Brent and Todd Esse and 5E, jointly and severally, the sum of $150,000.00 as attorneys fees for the services of their counsel through completion of trial. It is further,

ORDERED that in the event this case is unsuccessfully appealed by Defendants to the Court of Appeals, then Plaintiffs, Westgate and Havis shall have and recover from Brent and Todd Esse and 5E jointly and severally the sum of $25,000.00 as fees for the services of their counsel in the Court of Appeals.

The judgment also awarded the recovery of additional attorney's fees by "Plaintiffs, Westgate and Havis" from "Brent and Todd Esse and 5E, jointly and severally, the sum of $4,000" in the event of an unsuccessful petition for review to the Texas Supreme Court and an additional $18,000 in the event the petition were to be granted and briefing on the merits required but were ultimately to prove unsuccessful. The judgment also awarded post-judgment interest and costs against the defendants, jointly and severally, and concluded that "[a]ll other relief not specifically granted or denied in this judgment is denied."

The Esses and 5E filed this appeal of the trial court's July 15, 2008 judgment on October 22, 2008.

BP, Empire, and Westgate filed a motion for entry of judgment nunc pro tunc on April 28, 2009, after appellate briefing was submitted to this Court. On June 5, 2009, the trial court entered a Nunc Pro Tunc Judgment that stated, "BP American Production and Empire Energy, III, Ltd. have and recover from Defendants Westgate Energy Partners *and 5E Oil & Gas Corp.* $224,158.00 representing amounts owed under the contract between Empire and Westgate and the Court's finding of alter ego." (emphasis added). The June 5, 2009 judgment also stated that Westgate and Havis's recovery of $76,750 was "for fraudulent transfer of Westgate's assets." Regarding attorney's fees, the June 5 judgment provided "that both plaintiffs Westgate and Havis" recover $150,000 for attorney's fees "for the services of their counsel through completion of trial," $25,000 for attorney's fees "for the service of their counsel in the Court of Appeals," and $4,000 for attorney's fees "for the services of their counsel in the Supreme Court of Texas." Finally, the June 5, 2009 judgment provided that "both plaintiffs, Westgate and Havis shall have and recover from Brent and Todd Esse and 5E, jointly and severally the sum of $18,000, as fees for the services of their counsel in the Supreme Court" in the event the supreme court orders full briefing on the merits and the defendants are ultimately unsuccessful on appeal.

## Judgment Nunc Pro Tunc

 BP, Empire, and Havis as trustee for Westgate filed a motion requesting

that we take judicial notice of the trial court's June 5, 2009 judgment nunc pro tunc. The Esses argue that the June 5, 2009 judgment is void because the trial court's plenary power had expired and the changes made to the judgment amounted to more than a correction of a clerical error.

Texas Rule of Civil Procedure 329b(d) provides that a trial court has plenary power for 30 days after a judgment is signed to grant a new trial or to vacate, modify, correct, or reform the judgment. TEX.R. CIV. P. 329b(d). However, Rule 316 provides:

> Clerical mistakes in the record of any judgment may be corrected by the judge in open court according to the truth or justice of the case after notice of the motion therefor has been given to the parties interested in such judgment, as provided in Rule 21a, and thereafter the execution shall conform to the judgment as amended.

TEX.R. CIV. P. 316. Thus, after a trial court loses its jurisdiction over a judgment, it can correct clerical errors in the final judgment by signing a judgment nunc pro tunc, but it cannot correct a judicial error made in rendering final judgment. *Escobar v. Escobar*, 711 S.W.2d 230, 231 (Tex.1986). Whether an error in a final judgment is a judicial or clerical error is a question of law. *Id.* at 232. When deciding whether a correction is of a judicial or a clerical error, we look to the judgment actually rendered, not the judgment that should or might have been rendered. *Id.* at 231.

A clerical error is a discrepancy between the entry of a judgment in the record and the judgment that was actually rendered and does not arise from judicial reasoning or determination. *Hernandez v. Lopez*, 288 S.W.3d 180, 184 (Tex.App.-Houston [1st Dist.] 2009, no pet.). A judi-

cial error occurs in the rendering, as opposed to the entering, of a judgment and arises from a mistake of law or fact that requires judicial reasoning to correct. *Id.* at 184–85. The court can only correct by judgment nunc pro tunc the entry of a final written judgment that incorrectly states the judgment actually rendered. *Escobar*, 711 S.W.2d at 231–32. Judicial errors may not be corrected after the trial court loses plenary power. *Riner v. Briargrove Park Property Owners, Inc.*, 976 S.W.2d 680, 682 (Tex.App.-Houston [1st Dist.] 1996, no writ). A judgment rendered to correct a judicial error after plenary power has expired is void. *Hernandez*, 288 S.W.3d at 185; *Riner*, 976 S.W.2d at 682.

Here, BP, Empire, and Westgate argued in their motion for entry of judgment nunc pro tunc that the final judgment rendered on July 15, 2008 contained clerical errors. Specifically, they argued that the trial court "awarded plaintiffs damages pursuant to its breach of contract action against Westgate and its alter ego claims against defendant 5E. However, the award of contractual damages is made only against Westgate, and not 5E." They also argued that the trial court's failure to award BP and Empire attorney's fees for services rendered through the completion of trial was a clerical error because BP and Empire were included as recipients of the conditional appellate attorney's fees. BP, Empire, and Westgate point to the trial court's findings that 5E was liable as the alter ego of Westgate and that BP, Empire, and Havis as Westgate's trustee were all entitled to attorney's fees.

The trial court's June 5, 2009 judgment subsequently ordered that BP and Empire could recover the amounts owed on their breach of contract claim from Westgate and from 5E. However, the omission of 5E as a party liable for the breach of contract

claims was an error in rendering the judgment, not an error in the entry of judgment. The addition of 5E as another party against whom BP and Empire could collect for breach of contract goes beyond the correction of a clerical error. Indeed, a judgment awarding various sums of money to several plaintiffs is "a solemn judicial act on the part of the Court." *C & S Truck Line v. Valentine,* 640 S.W.2d 341, 342 (Tex.App.-Beaumont 1982, no writ).

■ The trial court's June 5, 2009 judgment also changed the award of attorney's fees to include BP and Empire in addition to Westgate and Havis. The wording awarding both Westgate and Havis attorney's fees likewise constituted more than correction of clerical error. An award of damages, interest, or attorney's fees may not be substantively and materially changed by a judgment nunc pro tunc. *See Riner,* 976 S.W.2d at 683.

Thus, we grant the motion to take judicial notice of the June 5, 2009 judgment nunc pro tunc but hold that it is void. We consider only the trial court's July 15, 2008 judgment.

### Standard of Review

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal sufficiency of the evidence used to support them just as we would review a jury's findings. *Daniel v. Falcon Interest Realty Corp.,* 190 S.W.3d 177, 184 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994)). In conducting a legal-sufficiency review, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Brown v. Brown,* 236 S.W.3d 343, 348 (Tex.App.-Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. We must sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Arias v. Brookstone, L.P.,* 265 S.W.3d 459, 468 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986)). The trial court acts as fact-finder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.,* 190 S.W.3d 108, 111 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

### Fraudulent Transfer

In their first issue, the Esses argue that the trial court erred in finding that Todd and Brent Esse had the specific malicious intent necessary for fraudulent transfer, conspiracy, breach of fiduciary duty, or usurpation of corporate opportunity theories. Specifically, they argue that they are protected by the fact that they took action based on the advice of counsel and that their conduct could not have been mali-

cious if they were advised by counsel that the transactions were legally permissible.[5]

In their second issue, the Esses argue that the evidence was legally and factually insufficient to support the trial court's finding that Todd and Brent Esse made fraudulent transfers or had conspired to do so. Specifically, Todd and Brent argued that they were neither the transferor nor the transferee and thus could not be personally liable for fraudulent transfer and that they lacked the requisite intent.

We consider these issues together.

### A. Intent to Defraud Under the Fraudulent Transfer Act

The Esses argue that the evidence supporting the trial court's findings that the sale of the Mallet prospect to 5E, the $10,000 payment to Boone, and the attorney's fees paid to HWA were fraudulent transfers was legally and factually insufficient because "Todd and Brent lacked the requisite intent to harm under either prong of the fraudulent transfer act" because "lawyers guided them through each transaction and advised the Esses that their actions were permissible under Texas law."

#### 1. Malicious Intent

■ A fraudulent transfer is a transfer by a debtor with the intent to hinder, delay, or defraud his creditors by placing the debtor's property beyond the creditor's reach. TEX. BUS. & COM.CODE ANN. § 24.005(a)(1) (Vernon 2009) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a

reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."); *Hahn v. Love*, 321 S.W.3d 517, 524 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (citing *Nobles v. Marcus*, 533 S.W.2d 923, 925 (Tex.1976)).

However, the Texas Uniform Fraudulent Transfer Act (TUFTA) also provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*Id.* § 24.006(a). Thus, a transfer may still be shown to be fraudulent without any actual intent on the part of the debtor to hinder, delay, or defraud a creditor if the provisions of section 24.006(a) are met. *See id.*

The Esses do not challenge the trial court's finding that (1) BP and Empire's claims arose before the three transfers for which the Esses were held liable; nor do they challenge the trial court's finding that (2) the transfers "were, taken together, substantially all of Westgate's assets" and that Westgate was made insolvent by these transfers. This unchallenged evidence is sufficient to establish liability under section 24.006(a) of the TUFTA if

---

5. We note that the trial court entered judgment in favor of BP and Empire on their breach of contract claim against Westgate, and it entered judgment in favor of Westgate and Havis, as trustee, on the fraudulent transfer claims against the Esses and 5E. The Esses only attack the portion of the judgment awarding Westgate and Havis damages for fraudulent transfer, and they do not address or complain about any one finding of fact or conclusion of law, so we limit our analysis to any findings that were necessary to support the trial court's judgment on the claim of fraudulent transfer.

there is sufficient evidence to establish that (3) appellants failed to receive reasonably equivalent value for the transfers complained of. *See id.* Under the plain language of the statute, a transaction can be considered a fraudulent transfer under section 24.006(a) without a finding of "malicious intent" or any actual intent to defraud. *See id.; Glenney v. Crane,* 352 S.W.2d 773, 775 (Tex.Civ.App.-Houston 1961, writ ref'd n.r.e.); *see also United States v. Corpus,* 491 F.3d 205, 210 (5th Cir.2007). Thus there was no need for appellees to prove that the Esses had fraudulent intent in order for them to be found liable for fraudulent transfer under section 24.006(a).

### 2. *Advice of Counsel*

 The Esses also contend that they cannot be held liable because they relied on the advice of counsel. The Esses cite the Texas Business Corporations Act, articles 2.41 and 2.42, arguing that "Brent Esse was entitled to these statutory protections for corporate directors." *See* Tex. Bus. Corp. Act Ann. art. 2.41 (Vernon Supp. 2009), art. 2.42 (Vernon 2003) (providing for liability of directors and shareholders of a corporation in certain cases and for officers of a corporation). However, this argument was not included in the pleadings and was not presented in the trial court, and thus is waived. *See* Tex.R.App. P. 33.1(a). Moreover, Texas law does not recognize any common law defense allowing a debtor who has made a fraudulent transfer to escape liability because he relied on the advice of counsel, nor do the

Esses cite any support for this proposition. Therefore, this contention is likewise waived. *See* Tex.R.App. P. 38.1(i).

We overrule appellants' first and second issues to the extent they contend that proof of intent was required to establish appellants' liability for fraudulent transfer under the circumstances of this case. Therefore, we address whether the evidence was sufficient to support the trial court's findings that Westgate made the transfers without receiving a reasonably equivalent value in exchange.

### B. *Reasonably Equivalent Value*

#### 1. *The transfer of the Mallet Prospect*

 The Esses argue that 5E paid fair market value for the transfer of the Esses' interest in the Mallet prospect to it and that the trial court's valuation of the prospect as worth $78,000 "has no legitimate foundation." However, the Esses' own witness, Daniel Boone, testified that the Mallet prospect was properly valued at $78,000. Ferstler, a principal of Empire, likewise presented separate testimony that the value of the Mallet prospect at the time Westgate transferred it to 5E was $80,000.[6]

The uncontested evidence demonstrated that 5E paid $37,715 for the Mallet prospect. The testimony of Boone and Ferstler was legally sufficient to support the trial court's finding that the amount received by Westgate "was less than half the actual value" of the interest, and, thus, Westgate did not receive reasonably equivalent value in exchange for its transfer of

---

6. The Esses' brief raises complaints concerning Boone's and Ferstler's qualifications to testify about the value of the property. It seems that the Esses are attempting to argue that the trial court erred in admitting Boone's and Ferstler's testimony on the value of the property. However, they cite no case law or authority supporting their contentions on this point, so it is waived. *See* Tex.R.App. P.

38.1(i). To the extent that the Esses are complaining that Boone's and Ferstler's testimony was not credible, we likewise find their arguments unavailing. The trial court, as fact finder, is the sole judge of the weight and credibility of a witness's testimony. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.,* 190 S.W.3d 108, 111 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

the Mallet prospect to 5E. *See City of Keller,* 168 S.W.3d at 822, 827 (we credit favorable evidence if reasonable fact-finder could, consider evidence in light most favorable to finding under review, and indulge every reasonable inference that would support it). Furthermore, the Esses' appellate brief does not cite to any evidence supporting their valuation of the Mallet prospect. Thus, we cannot say that, after considering and weighing all the evidence, that the trial court's finding was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and thus the evidence in support of the trial court's finding was factually sufficient as well. *See Arias,* 265 S.W.3d at 468.

### 2. $10,000 payment to Boone

■■■■ The Esses argue that Westgate's $10,000 payment to Boone for engineering work on the Mallet prospect was not a fraudulent transfer. They argue that "5E reimbursed Westgate for the $10,000 payment to Boone when the Mallet prospect sale occurred as that amount was included in the purchase price." The Esses also argue that this was a legitimate expense incurred by Westgate.

The evidence presented at trial indicated that this payment was made to Boone nine months after he performed the engineering work on the Mallet prospect, that Boone had not been previously paid for any of his consulting work on the Preston well or the Mallet prospect, and that Westgate transferred the Mallet prospect to 5E just a month after it made the payment to Boone. This evidence is sufficient to support the trial court's finding that Westgate did not receive reasonably equivalent value from the payment it made to Boone. *See City of Keller,* 168 S.W.3d at 822, 827.

The Esses' argument that Westgate was compensated for the $10,000 payment to Boone because that amount was included

in the price 5E paid for the Mallet prospect also fails. We have already upheld the trial court's finding that Westgate received less than half the value of the Mallet prospect even before taking into account the money Westgate spent on Boone's engineering work on that prospect. We cannot say that, after considering and weighing all the evidence regarding this transfer, the trial court's finding was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Arias,* 265 S.W.3d at 468.

### 3. Payments to HWA

■■■■ The Esses argue that the payments to HWA were for Westgate's benefit, and that Todd Esse had loaned Westgate the money to pay those obligations up until 5E purchased the Mallet prospect. They further argue that Todd Esse then resumed paying those obligations after the proceeds from the sale of the Mallet prospect were exhausted. Finally, they argue that they were entitled to prefer one creditor over another. The Esses present no legal argument or authority in support of their claims. They are thus inadequately briefed and are waived. *See* Tex. R.App. P. 38.1(i).

### 4. The Esses' liability as persons for whose benefit the transfers were made

■■■■ Finally, the Esses argue that the Fraudulent Transfer Act does not authorize Westgate's trustee to recover damages from Brent or Todd because they were not the transferor, transferee, or a person for whose benefit the transfer was made, because the transactions were not for Todd or Brent's direct, personal benefit. They argue, "Certainly, as shareholder[s], the transfer was of benefit to the Esses, but that is not enough to hold them responsible under the fraudulent transfer statute,"

and they also argue that to do so "would contravene the statutory imperative that, absent actual fraud or an express agreement to assume personal liability, a shareholder may not be held liable for corporate obligations."

The trial court found that "Brent and Todd Esse assented to and benefited from these transfers." The uncontested evidence demonstrates that members of the Esse family were the only shareholders of both Westgate and 5E, with Brent and Todd controlling the vast majority of the shares of both. Thus, their actions resulted in more than just an incidental or indirect benefit to them. Under the plain meaning of the statute, Brent and Todd Esse were both "person[s] for whose benefit the transfer was made." *See* TEX. BUS. & COM.CODE ANN. § 24.009(b)(1) (Vernon 2009) (providing that judgment under TUFTA may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made"). Although the Esses argue that the benefit they received as shareholders in 5E is not enough to hold them responsible under the fraudulent transfer statute, they cite no authority supporting their proposition, and this argument is therefore waived. TEX. R.APP. P. 38.1(i).

We overrule the Esses' first and second issues.

### Alter Ego

In their fourth issue, the Esses argue that the trial court erred in characterizing 5E as Westgate's alter ego, thus making it also liable for the fraudulent transfers. However, 5E is not liable for the fraudulent transfers because it is the alter ego of Westgate; rather, it is liable because it was the recipient of the transfers. *See* TEX. BUS. & COM.CODE ANN. § 24.009(b)(1). Moreover, no damages for fraudulent transfer were awarded against 5E as Westgate's alter ego in the original July 15, 2008 judgment.

Although the trial court's finding that 5E was the alter ego of Westgate would have been relevant had the trial court entered judgment against 5E on BP and Empire's breach of contract claims against Westgate, we have already determined that the trial court was without plenary power when it substantively and materially amended the July 15, 2008 judgment by awarding BP and Empire contract damages against 5E in its June 5, 2009 judgment, and that judgment is therefore void. Thus, this issue is moot.

We overrule the Esses' fourth issue.

### Breach of Fiduciary Duties

In their third issue, the Esses argue that the evidence is legally and factually insufficient to support the trial court's finding that Todd and Brent Esse breached their fiduciary duties to Westgate. However, this was an alternative theory, and the Esses admit that "the trial court entered judgment on the fraudulent transfer claims," while arguing only that "the fiduciary duty claims fail for the same reasons discussed above." They also complain about the trial court's findings of usurpation of corporate opportunity.

None of these findings was necessary to support the Esses' liability for fraudulent transfer about which they complain on appeal. Because no relief is sought from any action of the trial court in entering these findings and we have already sustained the trial court's findings as to the Esses' liability for fraudulent transfer, this issue is moot.

### Attorney's Fees

In their fifth issue, the Esses argue that the trial court erred in awarding

attorney's fees to Havis, the trustee for Westgate.

Parties claiming attorney's fees must "segregate fees between claims for which they are recoverable and claims for which they are not" and are "required to show that attorney's fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex.2006) (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991)). However, an exception to the duty to segregate attorney's fees applies when "claims aris[e] out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *See Stewart Title Guar. Co.*, 822 S.W.2d at 11 (quoting *Flint & Assoc. v. Intercont'l Pipe & Steel, Inc.*, 739 S.W.2d 622, 624–25 (Tex. App.-Dallas 1987, writ denied)).

Here, when the Esses placed Westgate in bankruptcy after suit had been filed against them by Empire and BP, all causes of action in this lawsuit against Westgate's corporate fiduciaries and for improper use and transfer of its assets became the property of the bankruptcy trustee, Havis, and subject to collection by him. *See* 11 U.S.C.A. § 548(a)(1) (West 2004 & Supp. 2010) (empowering trustee to avoid fraudulent transfers); § 704(a)(1) (West Supp. 2010) (requiring trustee to "collect and reduce to money the property of the estate for which such trustee serves"); *La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir.1988) (holding that trustee is bound to assert cause of action pursuant to section 704(a) if doing so would maximize value of estate). Havis authorized the continuation of the suit against the Esses and 5E, and he hired Chris DiFerrante, BP and Empire's attorney, to prosecute the Plaintiffs' and Westgate's claims against the Esses and 5E.

The trial court found that Westgate and Havis were entitled to attorney's fees for bringing Westgate's fraudulent transfer cause of action against the Esses and 5E. The trial court also found that BP and Empire were entitled to attorney's fees on their breach of contract action and on the fraudulent transfer claims. Finally, the trial court found that there was "no evidence or legally insufficient evidence" for it to determine what amount of attorney's fees "spent or actually incurred in this case" applied to the breach of contract action and which applied to the fraudulent transfer cause of action. The trial court's July 15, 2008 order awarded Westgate and Havis $150,000 from the Esses and 5E, jointly and severally, for "attorney's fees for the services of their counsel through completion of trial."

In order to prove a claim for fraudulent transfer of Westgate's assets, the trustee had to prove (1) that a transfer made by Westgate was fraudulent as to a creditor whose claim arose before the transfer was made, (2) Westgate made the transfer without receiving a reasonably equivalent value in exchange, and (3) Westgate was insolvent at that time or became insolvent as a result of the transfer. TEX. BUS. & COM.CODE ANN. § 24.006(a). Specifically, the trustee had to prove that the Esses' transfer of corporate funds to pay Boone, the transfer of payment for the Mallet prospect, and the transfer to HWA were made after the claims of breach of BP and Empire, Westgate's creditors, had arisen under their contracts with Westgate. Thus, proof of BP's and Empire's breach of contract claims against Westgate was required in this case to establish an essential element of the trustee's fraudulent transfer claim, and that claim could not be

proved without proof of the intertwined contract claims.

The trustee, Havis, is clearly entitled to attorney's fees for successfully prosecuting Westgate's fraudulent transfer cause of action under section 24.013 of the Fraudulent Transfer Act, which provides, "In any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just." *Id.* § 24.013 (Vernon 2009). Likewise, BP and Empire are entitled under section 24.013 to recovery of attorney's fees for the successful prosecution of the breach of contract action that served as the necessary foundation for the fraudulent transfer action. *See id.* (permitting recovery of such fees as are "equitable and just"). Moreover, the same attorney, DiFerrante, represented the bankruptcy trustee, Havis, and BP and Empire in continuing and successfully completing the prosecution of the fraudulent transfer and contract action begun by BP and Empire against Westgate that resulted in the judgment awarded against the Esses and 5E. Nor was it necessary, or even possible, that the fees be segregated. Rather, the exception to the duty to segregate attorney's fees applies because the trustee's and BP and Empire's "claims aris[e] out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *See Stewart Title Guar. Co.*, 822 S.W.2d at 11.

We overrule the Esses' fifth issue.

### Conclusion

We affirm the judgment of the trial court.