**Opinion issued August 30, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-21-00042-CV**

———————————

**RSS MSBAM2014C17-TX HAH, LLC, Appellant**

**V.**

**HOUSTON AIRPORT HOSPITALITY LP, PACIFICA HOSTS, INC., AND PACIFICA HARBOR VIEW TWO, L.P., Appellees**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-06512**

---

## MEMORANDUM OPINION

This appeal is about a nonrecourse loan secured by a hotel. Among other things, the loan required the borrower, Houston Airport Hospitality LP ("HAH"), to (1) remain solvent and pay its liabilities only from its own funds, (2) make monthly debt payments, (3) keep the hotel free from mold, and (4) avoid waste. About three

years after it obtained the loan, HAH stopped making payments, defaulted on the loan, voluntarily surrendered the hotel, and consented to foreclosure. Litigation followed.

The lender, RSS MSBAM2014C17-TX HAH, LLC ("Lender"), sued HAH and its guarantor, Pacifica Hosts, Inc. ("Hosts"), alleging that the loan became recourse upon HAH's breach of certain covenants and seeking a deficiency judgment or, at least, repair costs. Lender alleged that HAH had breached the loan covenants by failing to remain solvent, allowing the hotel to fall into disrepair, and not using commercially reasonable efforts to fight mold in the hotel. Lender also alleged that HAH had fraudulently transferred cash to its equity holders before defaulting on the loan. And it sought to void the transfer to one transferee, Pacifica Harbor View Two, L.P. ("Harbor"), under the Texas Uniform Fraudulent Transfer Act ("TUFTA").[1] HAH, Hosts, and Harbor (collectively, "Appellees") answered and counterclaimed for declaratory judgment, conversion, and attorney's fees.

The case went to a bench trial. At the close of Lender's case-in-chief, the trial court granted Appellees' oral motion for judgment and dismissed all of Lender's claims. Later, the trial court granted the declaratory judgment counterclaim, denied the conversion counterclaim, and awarded Harbor attorney's fees for its successful defense of the TUFTA claim.

---

[1]    *See* TEX. BUS. & COM. CODE §§ 24.001–.013.

In seventeen issues on appeal, Lender challenges the legal and factual sufficiency of the evidence to support the trial court's findings and conclusions that:

(1)     HAH did not breach the loan's covenant to remain solvent and pay its liabilities only from its own funds;

(2)     HAH's cash transfer to Harbor before defaulting on the loan was not actually or constructively fraudulent under TUFTA;

(3)     HAH did not commit waste or fail to use commercially reasonable efforts to keep the hotel free of mold; and

(4)     HAH did not commit waste by failing to repair or replace mechanical equipment at the hotel.

Lender also challenges the declaratory relief awarded to Appellees and the TUFTA attorney's fees awarded to Harbor.

We reverse and remand as to the attorney's fees but affirm the rest of the trial court's judgment.

## I. Background

HAH is a special purpose entity formed by Hosts.[2] In 2007, HAH bought a 414-room hotel, built in 1971, located near the George Bush Intercontinental Airport in Houston, Texas ("Property"). A former hotel manager, C. Madden, described the

---

[2]     Special purpose entities protect lenders by isolating assets serving as collateral from the potential bankruptcy estate of the borrower. *See Basic Cap. Mgmt., Inc. v. Dynex Com., Inc.*, 348 S.W.3d 894, 896 n.4 (Tex. 2011) (citing *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 49 n.15 (Bankr. S.D.N.Y. 2009)); *see also In re Pacific Lumber Co.*, 584 F.3d 229, 250 (5th Cir. 2009) ("Special purpose entities are often used in securitized lending because they are bankruptcy-remote, that is, they decrease the likelihood that the originator's financial trouble will affect the special purpose entity's assets serving as collateral for the notes.").

Property as in "poor" condition then, having worn carpets, "a lot of problems with plumbing" and other infrastructure, and "mold and mildew issues." To obtain a franchise agreement with InterContinental Hotels Group ("IHG") for operating the Property as a Holiday Inn, Hosts undertook an $8-million property improvement plan ("PIP"). The PIP brought the Property into compliance with the IHG brand standards and included mold remediation and special product selection, like marine drywall.

### HAH obtains a nonrecourse mortgage loan on the Property

In June 2014, HAH pledged the Property as collateral for a $20,725,000 mortgage loan from Bank of America, N.A. ("Loan"). Bank of America and HAH executed a Loan Agreement, Promissory Note, and Deed of Trust and Security Agreement. Hosts guaranteed the Loan ("Guaranty"). And all three parties executed an Environmental Indemnity Agreement ("Environmental Indemnity"). Together, the Loan Agreement, Promissory Note, Deed of Trust and Security Agreement, Guaranty, and Environmental Indemnity are the "Loan Documents."

In connection with the Loan, Bank of America obtained property condition, environmental, and market-value assessments of the Property. The property condition report described the Property's plumbing as in "good condition" and the heating, ventilation, and air conditioning ("HVAC") system as "vary[ing] in age" but also "in generally good to fair condition." The inspector "observed interior areas

4

of the subject building for the presence of mold, conditions conducive to mold, and evidence of moisture in readily accessible areas of the building" but did not find any "visual indications" of mold. The report explained:

> No sampling was conducted as part of this assessment. This limited observation was conducted for overview purposes only; additional suspect areas may exist in concealed locations (behind walls and ceilings, etc.). The observations and conclusions are based on interviews with property personnel and conditions as observed in readily accessible areas of the building on the assessment date.

Based on these observations, the report concluded that "the presence of mold is not considered to be a concern to the [Property] and no further action is recommended at this time."

For the environmental report, the inspector performed "limited observations" of "easily accessible areas" for "obvious signs of moisture, water intrusion, and potential mold" at the Property and found "[n]o musty odors indicative of a moisture problem" and "[n]o obvious visual evidence of mold, water intrusion, water damage, or standing water." The environmental report recommended "no further investigation . . . at this time regarding moisture and mold."

CBRE, Inc. appraised the Property. It concluded that, in March 2014, the Property had an "as is" market value of $33,600,000, including $2,691,000 for furniture, fixtures, and equipment ("FF&E").

Through assignments, Lender succeeded to Bank of America's interest in the Loan Documents in 2017. Wells Fargo was appointed Master Servicer to administer the Loan, and Rialto Capital ("Rialto") was appointed Special Servicer.

### *The key Loan terms*

The Loan Agreement required HAH to make principal and interest payments on the first of each month. A failure to make a payment within five days of it being due would be an event of default. Upon an event of default, Lender could declare the debt immediately due and avail itself of any rights or remedies provided in the Loan Documents.

The Loan was generally nonrecourse,[3] meaning Lender could exercise remedies against the Property and any other prearranged security but not against

---

[3] "A recourse loan 'allows the lender, if the borrower defaults, not only to attach the collateral but also to seek judgment against the borrower's (or guarantor's) personal assets.'" *Pineridge Assocs. v. Ridgepine, LLC*, 337 S.W.3d 461, 465 (Tex. App.—Fort Worth 2011, no pet.). Conversely, the maker of a nonrecourse loan "does not personally guarantee repayment of the note and will, thus, have no personal liability." *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 266 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). "[A] nonrecourse note has the effect of making the note payable out of a particular fund or source, namely, the proceeds of the sale of the collateral securing the note, rather than having the maker of the note personally guarantee repayment." *Melton v. CU Members Mortg.*, 586 S.W.3d 26, 33 (Tex. App.—Austin 2019, pet. denied); *accord Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 819 (6th Cir. 2015) ("When a borrower defaults on a nonrecourse loan, the lender may foreclose on the asset and any other prearranged security, but the borrower and its guarantors do not become personally liable for any deficiency.").

HAH or Hosts for any deficiency.[4] But the nonrecourse provision was subject to certain "carve outs" or exceptions under which Lender could recover more than the security from HAH or Hosts, including indemnity for losses or damages suffered by Lender because of a breach of certain covenants or any deficiency between the value of the security and the Loan obligation.

Relevant here, the Loan Agreement would become fully recourse upon a material breach of certain covenants in the single purpose entity clause that were not cured within 15 days of notice from Lender or HAH's knowledge of the breach. Section 6.1 listed several covenants related to HAH's status as a single purpose entity and its separateness. One such covenant was the solvency covenant promising that, until the debt was paid in full, HAH would not "fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds."

In addition, the Loan Agreement allowed Lender to hold HAH and Hosts jointly and severally liable for losses from (1) "any act of actual waste" by HAH or Hosts and (2) "the breach of any representation, warranty, covenant or

---

[4]     Specifically, Lender agreed to enforce the Loan obligations through foreclosure or an action for specific performance instead of a money judgment against HAH or Hosts. Any judgment in such proceedings would be enforceable "only to the extent of [HAH's and Hosts'] interest in the Property, in the Rents, and in any other collateral given to Lender." Lender agreed not to "seek or demand any deficiency judgment against [HAH] or [Hosts]."

7

indemnification set forth in Article 12 . . . concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in any document."

In Article 12, HAH warranted that, except as stated in the environmental report, "to the best of [its] knowledge . . . the Property is free of Mold." "Mold" is a defined term meaning:

> any mold, fungi, bacterial or microbial matter present at or in the Property, including, without limitation, building materials which is in a condition, location or a type which will pose a risk to human health or safety or the environment, will result in damage to or would adversely affect or impair the value or marketability of the Property.

HAH had to "use commercially reasonable efforts" to keep the Property free of Mold. A failure to do so expressly constitutes "bad faith waste" under the Loan Agreement.

### *HAH defaults and turns the Property over to a receiver*

According to HAH, several issues arose at the Property after it obtained the Loan. The Property faced aging mechanical equipment and systems. And beginning in 2014, the Property suffered air quality and mold issues, which HAH described as typical in Houston's environment. These issues coincided with a downturn in the Houston economy because of falling oil prices, which hurt revenues from the Property.

8

HAH worried that it might breach the Loan Agreement's debt service coverage ratio, allowing Wells Fargo to sweep the cash in HAH's account for debt payments.[5] On January 26, 2017, S. Israni, Hosts' Managing Partner, emailed J. Cunningham, Hosts' Finance Director, a draft letter addressed to T. Murphy at Wells Fargo. The draft expressed the "challenges" at the Property because of "softening in the Houston market" and loss of major corporate accounts, including an account with Haliburton that had filled "anywhere from 70-30 rooms per night." It also noted that the IHG license would expire in May 2017. Although there was a new agreement with IHG, it required a PIP with "extensive renovations" to meet new brand standards. The draft outlined HAH's cost-control measures but stated that "with the Houston market depressed and the [Property] needing a renovation, cost control alone will not solve the problem." HAH requested the "deferral of principal payments for the next two years" and waiver of the debt service coverage ratio to avoid cash sweeps.

Three weeks later, in February 2017, Cunningham emailed Murphy about some ways to free up funds for operations, including funds reserved for FF&E. In

---

[5]     The Loan Agreement defines the "Debt Service Coverage Ratio" as "the ratio, as determined by Lender, of (i) Net Operating Income to (ii) the aggregate amount of Debt Service which would be due for the same period assuming the maximum principal amount of the Loan is outstanding and calculated using a payment constant based on the Note Rate and an amortization period of thirty (30) years." A cash sweep occurs when a borrower's account is converted into a debt payment during the cash sweep period.

making the Loan, Bank of America had required HAH to keep eight percent of the Property's gross income in reserve for certain expenses, instead of the industry standard four percent, knowing the IHG license would expire. Cunningham urged that the reserve should be reduced because a new franchise agreement was in hand. Not long after, Wells Fargo released about $330,000 from the FF&E reserve to HAH. After receiving those funds, HAH turned off the auto debit that enabled Wells Fargo to obtain monthly debt service from HAH's operating accounts.

HAH did not make its $242,348.60 loan payment on March 1, 2017. Cunningham told J. Stanton, director of loan workouts for special servicer Rialto, that HAH could not make any more Loan payments. Although Cunningham first testified that HAH could have paid the debt service, he later testified that he did not know if HAH could have made such payments after March 2017 without a capital call to its investors, which it never made.

Under the Loan Agreement, the failure to make a payment within five days is an event of default. Three days before its missed payment would become an event of default—on March 3—HAH issued $900,000 in checks to its equity holders, with $787,230 going to Harbor.[6] Israni acknowledged that HAH wanted to transfer the funds while the Loan was current, before any default. HAH defaulted on March 6.

---

[6]     The additional $112,770 went to HAH's other limited partners.

Around April 1, Lender advised HAH that it owed $489,819.78—the unpaid March debt service, a late fee, and April debt service. HAH did not make the April payment. On April 28, Lender notified HAH and Hosts that an event of default had occurred and accelerated the Promissory Note, making the entire Loan balance due. HAH continued to miss payments through August, when it agreed to turn the Property over to a receiver, V. Cuce. Cuce took possession of the Property and $32,112.29 in cash on August 21.

### *Condition of the Property*

The Property's condition when Cuce assumed control was disputed. S. Mazza, one of Rialto's real estate directors, visited the Property and noted out-of-order rooms, flooded rooms, mold damage, and inoperable elevators. Twenty-three terminal air conditioning ("PTAC") units were missing. According to Cuce, the Property needed 38 rooftop HVAC units, elevator repairs, and maintenance caused by water intrusion. He replaced the rooftop AC motors, fixed the broken elevator, and installed an extra water circulation pump to ensure a supply of hot water to guests in one area of the Property.

According to Lender, the mold conditions on the Property were "dire," and HAH and Hosts had long refused to remediate the mold or address the malfunctioning HVAC system. And this diminished the Property's value. Lender presented evidence that, in late 2014, Haliburton had expressed concerns about the

11

Property's condition and demanded an air quality test. HAH did the testing. But its general manager at the time, C. Madden, emailed people at Hosts, including Vice President of Operations W. Feenan and Israni, that he had "gamed the test so [the inspector] only sampled rooms on the 4th floor where the PTACs had been professionally cleaned and the rooms had been inspected for presence of mold." Madden recommended hiring an environmental engineer "to help come up with a solution" because Haliburton expected the issue to be resolved promptly.

In March 2015, Madden forwarded a proposal from Terracon Consultants, Inc. ("Terracon"), to Feenan and Israni, for assessing the Property's mechanical systems and recommending repairs or upgrades. Madden's email expressed concern that if the HVAC issues were not addressed, "our renovation efforts will not inhibit the mold and mildew issues alone." In June 2015, HAH contacted a contractor to replace rooftop HVAC units, but Hosts did not approve the work. Madden got another bid in November 2015 to replace five rooftop air handlers, but that also was not approved.

In July 2015, Madden sent Israni and Feenan pictures of two guest rooms with mold on the ceilings and walls after the rooms were closed for a couple of weeks for renovation. Replacement of the sheetrock and treatment with an antimicrobial spray was recommended. One week later, Madden advised Israni that 15 rooms were "affected by mold so badly that [the] staff cannot treat them." In addition, mold had

spread behind vinyl wallpaper in guest bathrooms and contaminated at least eight meeting rooms.

Around August 10, 2015, Terracon issued a report making more than 30 recommendations for the HVAC and other mechanical systems. Madden commented: "As expected, most of the equipment in place has far outlived its Expected Useful Life and needs to be replaced." HAH replaced the HVAC systems for one ballroom and the restaurant. But according to Lender's expert, D. Daniele, HAH did not implement most of Terracon's recommendations.

In July 2016, Mold Inspection & Testing ("MI&T"), retained by Express Jets in connection with potential bookings at the Property, prepared an air quality report. MI&T concluded that elevated mold conditions existed, that professional remediation was required, and that it was "imperative that any source of water intrusion be addressed to ensure mold growth does not return." During the 13 months between this report and Cuce's takeover, HAH retained no one to remedy these issues. The root cause of the mold was not discovered.

According to HAH, however, the mold and mildew on the Property were ordinary occurrences typical to Houston's environment and removed by housekeeping or maintenance employees. No guests stayed in rooms with visible mold. And it undertook renovation efforts. HAH's internal reports did not show that any rooms were out of order because of mold in June 2014.

13

Between 2014 and mid-2017, HAH spent $2,675,072.98 in capital expenditures, including repairs to some HVAC systems, electrical systems, and plumbing systems, as well as upgrades and replacements. HAH cleaned PTAC units using in-house maintenance employees and an outside contractor. HAH purchased around 300 new PTAC units and placed dehumidifiers throughout the Property. HAH also chose specific building materials to minimize mold at the Property.

When mold returned in different rooms in June 2016, HAH and Hosts committed to combat the mold using protocols from a licensed contractor. HAH never determined the cause or pattern of mold, but theories included dirty PTAC units, clogged drain pans, and bathroom exhaust fans.[7]

HAH and Hosts pointed out that between April 2015 and February 2017, Lender's own inspection reports showed the Property was in normal condition for its age, had general wear and tear, its major building components were functional, and faced minimal deferred and routine maintenance—all of which had no impact on marketability.[8] HAH and Hosts also identified Hurricane Harvey—which struck

---

[7]    HAH's Certificates of Mold Damage Remediation did not check the box certifying that "the underlying cause or causes of the mold that were identified for this project in the mold management plan or remediation protocol have been remediated."

[8]    As an example, Appellees point to evidence that the mold did not affect hotel operations for the Super Bowl in February 2017. All but 9 of 414 rooms were rented for the event—a 98% occupancy rate.

Houston only a few days after Cuce assumed control of the Property, flooded some rooms, and knocked out electrical power—as a potential source of mold.

### *Lender forecloses on the Property, then sues for the deficiency and losses*

Lender eventually foreclosed on the Property in July 2018. At the foreclosure sale, Lender bought the Property for a credit bid of $11,300,000, registering a deficiency claim of more than $10 million. Lender elected to hold the Property rather than sell it. Lender executed a new PIP with IHG for a full renovation of the Property and hired contractors to remediate mold and make other repairs. Lender's construction manager identified the cause of the mold as inoperable PTAC units in guest rooms, nonfunctioning exhaust fans in guest bathrooms, improper sealing of the building's exterior, and failure to paint and maintain the building's vapor barrier. After remediation, there was no recurrence of mold.

Six months after foreclosure, Lender sued HAH and Hosts, alleging: (1) HAH breached the Loan Agreement by allowing Mold to grow throughout the Property and failing to take commercially reasonable steps to prevent it; (2) Hosts was therefore liable under the Guaranty; and (3) both HAH and Hosts were liable under the Environmental Indemnity for the Mold infestation. Lender later added a claim for a deficiency judgment against HAH and Hosts based on a breach of the nonrecourse carveout for HAH's failure to remain solvent or pay its liabilities from its own funds. It also added Harbor as a defendant for its receipt of the allegedly

15

fraudulent transfer and sued HAH for fraudulent misrepresentations and warranties made in the Loan Documents about the Property's condition.

Appellees pleaded affirmative defenses and counterclaims for conversion and declaratory relief. The conversion counterclaim alleged that Hosts owned two vans turned over to the Receiver with the Property, which Lender refused to return or reimburse. Appellees also requested attorney's fees under the Texas Declaratory Judgments Act.

The case proceeded to a bench trial. After five weeks of testimony, Lender rested. Appellees moved for judgment, arguing that Lender had not presented legally or factually sufficient evidence of its claims. The trial court granted the motion as to all Lender's claims, finding Lender failed to meet its burden of proof, and entered an order that Lender take nothing against Appellees.

The trial court's order did not address Appellees' counterclaims for conversion or declaratory judgment. The parties filed competing motions. Lender moved for summary judgment on the declaratory judgment counterclaim, to sever the conversion counterclaim, and for entry of a final judgment. Appellees moved for judgment on both counterclaims, and Harbor requested attorney's fees and costs under TUFTA, instead of the Declaratory Judgments Act.

The trial court signed a final judgment:

(1)    awarding Harbor attorney's fees for trial and appeals;

(2)    denying Hosts' conversion counterclaim; and

(3)    declaring that:

(a)    "On or about March 3, 2017, HAH was not in violation of [Article 6, Section 6.1(xviii)'s solvency clause] because it did not fail to remain solvent or pay its own liabilities;"

(b)    "The March 3, 2017 transfers were not fraudulent (actual or constructive) transfers under Texas law;"

(c)    "The March 3, 2017 transfers were not in violation of the terms of the Loan;"

(d)    "The Loan only makes HAH personally liable for Losses resulting from any breach of Section 15.1(b)(i)-(xii) . . . ;" and

(e)    "Any alleged breach of Article 5 of the Loan, by itself, does not make HAH or Pacifica Hosts personally liable for losses caused by any such breach."

Lender timely requested findings of fact and conclusions of law, which the trial court issued after an abatement of this appeal.

## II. Standards of Review

After a plaintiff rests in a bench trial, a defendant may move for judgment. *See Est. of Ripley*, No. 04-18-00968-CV, 2019 WL 4179128, at *1 (Tex. App.—San Antonio Sept. 4, 2019, pet. denied) (mem. op.). When a trial court grants a motion for judgment at the close of a plaintiff's case-in-chief in a bench trial, we presume that the trial court, acting as the factfinder, ruled not only on the sufficiency of the evidence but also on its weight and the credibility of witnesses. *Qantel Bus. Sys.,*

17

*Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303–05 (Tex. 1988); *Huang v. Don McGill Toyota, Inc.*, 209 S.W.3d 674, 677 (Tex. App.—Houston [14th Dist.] 2006, no pet.). And we defer to the trial court's balancing of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The trial court may make findings of fact and conclusions of law after it grants a motion for judgment. *Huang*, 209 S.W.3d at 677. Conclusions of law and application of law to the facts are reviewed de novo. *Perry v. Del Rio*, 66 S.W.3d 239, 257 (Tex. 2001). But the legal and factual sufficiency of the evidence supporting the trial court's fact findings may be challenged using the standards that apply to jury verdicts. *Id.*; *see Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

A party attacking the legal sufficiency of an adverse finding on which it had the burden of proof must show that the evidence establishes, as a matter of law, all vital facts in support of its proposed disposition. *Huang*, 209 S.W.3d at 677. We review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id.* at 677–78.

A party attacking the factual sufficiency of an adverse finding on which it had the burden of proof must show that the finding is against the great weight and preponderance of the evidence. *Id.* at 678. We consider all the evidence and will set aside the finding only if it is so contrary to the overwhelming weight of the evidence

as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Huang*, 209 S.W.3d at 678; *see also Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 650 (Tex. 1988) (recognizing that appellate court may reverse and remand when a failure to find is against the great weight and preponderance of the evidence).

### III. Lender's Claims

In issues one through thirteen, Lender challenges the legal and factual sufficiency of the evidence supporting the trial court's findings rejecting its claims for breach of the Loan Agreement's solvency covenant, actual and constructive fraudulent transfer, the existence of Mold at the Property, and HAH's commitment of waste. We address these issues, in turn, as necessary to dispose of the appeal.

**A.    Full recourse claim based on breach of solvency covenant**[9]

Under the terms of the Loan Agreement, Lender's promise not to pursue recourse liability is "null and void" upon a material and uncured breach of any covenant in Article 6. Lender sought full recourse liability against HAH and Hosts

---

[9]    Lender submitted an oral argument exhibit suggesting that the Loan also became fully recourse because HAH failed to maintain adequate capital in violation of a separate covenant in Article 6, Section 6.1. Neither Lender's opening brief nor its reply challenge the trial court's finding that Lender "elicited no credible evidence or insufficient credible evidence of the inadequacy of HAH's capital." Accordingly, to the extent Lender makes that argument now, it is waived. *See Hutchison v. Pharris*, 158 S.W.3d 554, 564 (Tex. App.—Fort Worth 2005, no pet.) (issue not raised in opening appellate brief is ordinarily waived); *see also* TEX. R. APP. P. 38.1(i) (appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

based on breach of the solvency covenant in Article 6, Section 6.1(a)(xviii), which provides that, "[u]ntil the Debt has been paid in full," HAH will not "fail to remain solvent *or* pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds[.]" (Emphasis added.) The emphasized "or" is a disjunctive term, alternative in its effect. *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985); *see also Cmty. Bank of Raymore v. Chesapeake Exploration, L.L.C.*, 416 S.W.3d 750, 755 (Tex. App.—El Paso 2013, no pet.) ("'or' expresses a choice between two mutually exclusive possibilities") (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 872 (11th ed. 2009)). Thus, under a plain reading of the Loan Agreement, Lender had to show a breach of the solvency covenant through evidence of HAH's failure to (1) remain solvent or (2) pay its own liabilities only from its own funds. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (a breach of contract action requires proof of four elements, one of which is breach by the defendant).

The trial court concluded that HAH did not breach Section 6.1 and that Lender did not prove the claim by a preponderance of the evidence. Lender contends the trial court erred because the evidence proved HAH's failure to both remain solvent and pay its own liabilities only from its own funds as a matter of law. Alternatively, Lender says, the trial court's refusal to find a breach of the solvency covenant was against the great weight and preponderance of the evidence.

20

### 1. There is not conclusive or overwhelming evidence that HAH failed to remain solvent

Although the Loan Agreement contains 15 pages of defined terms, it does not define a "fail[ure] to remain solvent," "solvent," "solvency," or antonyms "insolvent" or "insolvency." Under settled interpretive principles, a contract's meaning depends on the contract's language. *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 656–57 (Tex. 2019); *see URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018) (interpretation of unambiguous contract is question of law courts review de novo using well-settled contract-construction principles). Our primary concern in construing a contract is to give effect to the written expression of the parties' intent. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). We afford the contract language its plain and ordinary meaning, unless the instrument indicates terms have been used in a technical or specialized sense. *Exxon Mobil*, 568 S.W.3d at 657. "Context is important, so we must examine the entire writing and will endeavor to harmonize and give effect to all the provisions so that none are rendered meaningless." *Id.*

Lender contends that the phrase "will not . . . fail to remain solvent" must mean "will not become insolvent," and that we should apply the plain and ordinary meaning of the antonym "insolvency" in measuring the evidence. As one Texas court observed, the meaning of "insolvency" is "not definitely fixed" and "not always used in the same sense." *Parkway/Lamar Partners, L.P. v. Tom Thumb*

*Stores, Inc.*, 877 S.W.2d 848, 849 (Tex. App.—Fort Worth 1994, writ denied). Rather, the meaning depends on "the business or fact situation to which the term applies." *Id.*; *cf.* 7 COLLIER ON BANKRUPTCY ¶ 101.32[4] (16th ed. 2009) (observing that litigation on the meaning of insolvency "generates a formidable and, on the surface, not always consistent stream of adjudications").

Referencing case law, a legal dictionary, and the statutory definitions in TUFTA, Lender asserts that "insolvency" in this context has two principal meanings: (1) an inability to pay debts as they become due ("cash flow insolvency") or (2) a balance sheet with liabilities greater than assets ("balance sheet insolvency"). *See D'Olivio v. Fox*, No. 05-18-00868-CV, 2020 WL 4047868, at *10 (Tex. App.—Dallas July 20, 2020, pet. denied) (mem. op.) (defining insolvency to mean "an inability to pay debts as they mature"); *Insolvency*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining insolvency to mean: "1. The condition of being unable to pay debts as they fall due or in the usual course of business. 2. The inability to pay debts as they mature."); *see also* TEX. BUS. & COM. CODE § 24.003(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."); *id.* § 24.003(b) ("A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."). According to Lender, no matter which meaning is applied, the evidence showed that HAH failed

22

to remain solvent until "the Debt [was] paid in full," which Lender defines as at foreclosure in July 2018.

While HAH and Hosts do not propose a different interpretation of the solvency covenant, they respond that Lender's argument fails because (1) expert testimony on insolvency was required but not presented,[10] and (2) the evidence was not so overwhelming as to mandate reversal under the sufficiency standards of review. We do not decide the necessity of expert testimony because, even assuming it was not required, the trial court's finding that HAH did not breach the solvency covenant is supported by legally and factually sufficient evidence.

### a. Cash flow insolvency

Lender contends that a few facts show that HAH could not pay its debts as they came due and thus was insolvent under the cash flow test—namely, that HAH did not make a Loan payment in March 2017 or thereafter, which was an event of default, and Lender's subsequent decision to accelerate the Note in April 2017, which made the full amount of the Note due. In other words, Lender contends that HAH's failure to make payments on the Loan itself is a breach of the solvency covenant that opens HAH and Hosts to full liability.

---

[10]  Generally, expert testimony is required when the subject concerns information or knowledge outside that of an ordinary layperson. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). A failure of proof can result if expert testimony is required but not presented. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92–93 (Tex. 2004).

Under the rules of contract interpretation, courts must try to harmonize and give effect to all provisions of a contract so that none are rendered meaningless. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). This means no single provision controls, and all provisions must be considered with reference to the entire instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). Reading the Loan Agreement as a whole, a key element of a nonrecourse loan the isolation of the asset being financed—here, the Property. This is an essential bargain between a borrower and a lender that permits financing on a nonrecourse basis: a lender agrees not to pursue recourse liability directly or indirectly against a borrower or its owners so long as the lender can rely on the assurance that the financed asset will be isolated from other endeavors, creditors, and liens related to the borrower or its affiliates. To that end, the Section 6.1 covenants that may create full recourse liability—including the solvency covenant— serve to preserve the borrower's status as a single purpose entity and restrain the borrower from certain behaviors that could put the financed asset at risk. *Avasthi & Assocs., Inc. v. Banik*, 343 S.W.3d 260, 264 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("[C]ourts strive to construe a contract to promote mutuality and to avoid a construction that makes promises illusory."). In this context, we question whether a failure to make a Loan payment can be considered a breach of the solvency covenant and, if so, it would render the promise of a nonrecourse loan illusory. *Cf.*

*Borman, LLC v. 18717 Borman, LLC*, 777 F.3d 816, 819 (6th Cir. 2015) ("Many in the [commercial mortgage-backed securities] loan industry intended solvency covenants to serve as a promise against filing for bankruptcy or colluding in an involuntary bankruptcy.").

To prevail on appeal, Lender must point to conclusive or overwhelming evidence that HAH missed the Loan payments because it was unable to pay. *Cain*, 709 S.W.2d at 176. With the above concerns in mind and considering the deference we afford to the trial court's fact findings, we disagree that the missed payments are conclusive or overwhelming evidence of HAH's cash flow insolvency because the nonpayment evidence is susceptible to more than one reasonable inference. *See City of Keller*, 168 S.W.3d at 815 (noting that conclusive evidence has only one logical inference); *Miranda v. Byles*, 390 S.W.3d 543, 553 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (noting that, in a bench trial, trial court determines the credibility of the witnesses and the weight to be given their testimony).

HAH disputed that it missed the March 2017 and subsequent payments because it was unable to pay. HAH claimed that the nonpayment was a strategic choice to force a renegotiation of the Loan's structure. Lender calls that explanation into question by pointing to other evidence that suggests HAH was unable to pay. Specifically, Lender points to the statement from Cunningham, Hosts' finance director, to Stanton, Rialto's loan-workout person, that HAH could not make any

further Loan payments and lacked the financial capability to do so. But Cunningham's statement was not free from contradiction. He acknowledged that he did not know if HAH could have paid monthly debt service after March 2017. And Israni, Hosts' managing director, testified that it would have been possible for HAH to make payments between March 2017 and August 2017, when Cuce took over as receiver, through a capital call. There was also evidence that HAH continued making capital expenditure payments after the March 2017 default and paid its other debts as they came due. The trial court was free to believe HAH's explanation of the reasons for nonpayment over Lender's. *See Miranda*, 390 S.W.3d at 552 (in resolving factual disputes, the trial court may believe one witness and disbelieve others).

The trial court could also consider the $1.2 million in reserve funds or the Property's multiple sources of revenue from ongoing hotel operations as evidence of HAH's ability to pay its debts as they came due. Although less revenue was being generated because of the economic downturn, the hotel was operational and saw boosts in connection with the Superbowl and Hurricane Harvey.

On this record, we cannot say Lender proved HAH's cash flow insolvency as a matter of law or that the trial court's refusal to find a cash flow insolvency is against the great weight and preponderance of the evidence.

### b. Balance sheet insolvency

Lender's theory of balance sheet insolvency—liabilities that exceed assets—also rests on acceleration of the Note. Lender asserts that when it accelerated the Note, HAH's liabilities grew to include the full Note balance of $22 million. But, in Lender's estimation, HAH's only significant asset—the Property—was worth far less, making HAH insolvent. In support, Lender points to the testimony of two experts—C. Peckholdt and J. Jaeger—who valued the Property at no more than $16.1 million, which was substantially less than the accelerated Note. Lender also points out that HAH did not offer a competing expert opinion on valuation. Still, we disagree that the expert opinions conclusively proved Lender's balance sheet theory.

Jaeger's opinion concerned the value of the Property after foreclosure. And the trial court expressly found Peckholdt's valuation was not credible. Peckholdt testified that, after inspecting the Property, he used an income capitalization approach to determine the Property's value. As part of that approach, he estimated that a buyer would have to spend $10 million in capital expenditures to restabilize the Property's occupancy level. Considering the anticipated future capital expenditures and several other factors, Peckholdt concluded that, as of June 23, 2017, the Property's fair market value was $16.1 million. He issued a second appraisal of the Property as of May 22, 2018, again reflecting a value of $16.1 million. But Peckholdt admitted that he forgot to consider taxes in his calculation.

27

After being alerted to the error by Lender's counsel, and without seeking to amend his reports, he testified that the Property's value should be reduced by 20% to $13.2 million.

The trial court was not required to accept Peckholdt's valuation. Certainly, the trial court's credibility decision must be reasonable. *City of Keller*, 168 S.W.3d at 820 (noting that a trial court cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted). Here, it was. While uncontroverted expert testimony may be conclusive if the expert's opinion is necessary and the evidence is otherwise credible and free from contradictions and inconsistencies, Peckholdt's opinion was none of those things. *See Truck Ins. Exch. v. Smetak*, 102 S.W.3d 851, 855 (Tex. App.—Dallas 2003, no pet.) (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998)). He admitted to errors in his calculation, and HAH's cross-examination called into question whether he (1) should have used a sales-comparison approach that would have yielded a higher valuation and (2) overestimated future capital expenditures. On this record, we cannot say that Lender established the Property's value as a matter of law, and thus we cannot say that Lender established HAH's balance sheet insolvency as a matter of law. *See Broussard v. Moon*, 431 S.W.3d 534, 537 (Tex. 1968) (witness's qualification as an expert does not preclude factfinder from exercising considerable

28

discretion in determining degree of reliance to afford expert's opinion); *Eggert v. State Bar of Tex.*, 606 S.W.3d 61, 67 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (trial court as trier of fact was the exclusive judge of the witnesses' credibility and the weight to be given their testimony); *Olin Corp. v. Smith*, 990 S.W.2d 789, 797 (Tex. App.—Austin 1999, pet. denied) ("Opinion testimony does not establish any material fact as a matter of law and is never binding on the trier of fact."). Neither can we say that the trial court's refusal to find HAH's insolvency based on Lender's balance sheet theory was against the great weight and preponderance of the evidence.

### 2. There is not conclusive or overwhelming evidence that HAH failed to pay liabilities only from its own funds

Lender argues that it can still prevail on the full recourse claim under the solvency covenant's second clause, prohibiting HAH from failing to pay its own liabilities only from its own funds. Lender asserts that no view of the evidence supports HAH's *ability* to pay liabilities only from its own funds after the March 2017 event of default. Instead, Lender says, the evidence conclusively established the opposite—"HAH was *unable* to pay its debt service from its own funds."

We find this argument unavailing for two reasons. First, the argument rests on an interpretation of the second clause of the solvency covenant that is functionally the same as a cash-flow insolvency, which would render the clause duplicative and thus meaningless. Settled interpretive principles preclude us from rendering part of

a contract meaningless. *See, e.g.*, *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (courts must read contract as a whole and try to harmonize and give effect to all its provisions so that none will be rendered meaningless).

Second, the argument rests on an interpretation of the solvency covenant that reads the words "able to" or "ability" into the second clause where they do not appear. That is, the solvency covenant does not provide that HAH will not fail to remain solvent or *be able to* pay its own liabilities only from its own funds. It provides that HAH will not "fail to remain solvent or *pay* its own liabilities . . . only from its own funds." (Emphasis added.) Because we cannot add words to the Loan Agreement and must interpret it as is, we conclude the relevant inquiry under this portion of the solvency covenant is not HAH's ability to pay its own liabilities from its own funds, but rather, whether it paid its liabilities using only its funds. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 n.41 (Tex. 2007) (stating that courts should construe contracts "as is" and not insert language by "judicial fiat"). Lender has not pointed to any evidence that HAH used someone else's funds to pay its debts. And thus, Lender has not shown that the evidence conclusively proved a breach of the solvency covenant's second clause or that the trial court's failure to find a breach of the solvency covenant's second clause was against the great weight and preponderance of the evidence.

We overrule Lender's first through third and sixth issues on breach of the solvency covenant.[11]

## B.    Fraudulent transfer claim

TUFTA prevents debtors from improperly moving assets beyond a creditor's reach. *See* TEX. BUS. & COM. CODE §§ 24.001–.013; *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016); *see also KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015) (TUFTA's main goal is "to protect creditors from being defrauded or left without recourse due to the actions of unscrupulous debtors"). Consistent with its purpose, TUFTA provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property. *See* TEX. BUS. & COM. CODE §§ 24.008–.009; *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). A transfer made with actual or constructive intent to defraud a creditor may be avoided to the extent necessary to satisfy the creditor's claim. *See* TEX. BUS. & COM. CODE §§ 24.005(a)(1)–(2), .006(a); *Janvey*, 487 S.W.3d at 562. A trial court may also award costs and reasonable attorney's fees in proceedings under TUFTA. *See* TEX. BUS. & COM. CODE § 24.013.

---

[11]    Given our holdings, we need not reach Lender's fourth or fifth issues addressing other elements of the full recourse claim. *See* TEX. R. APP. P. 47.1.

In its seventh, eighth, and ninth issues, Lender argues that the trial court should have voided the $787,230 transfer from HAH to Harbor because it violated more than one TUFTA provision.

## 1. Actual fraud

Lender first argues that the transfer to Harbor was fraudulent under TUFTA section 24.005(a)(1) because HAH made the transfer with the "actual intent to hinder, delay, or defraud" Lender. TEX. BUS. & COM. CODE § 24.005(a)(1). Because direct proof of a fraudulent intent is often unavailable, courts may consider circumstantial evidence, including the nonexclusive factors listed in TUFTA and commonly referred to as "badges of fraud." *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007, no pet.); *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see* TEX. BUS. & COM. CODE § 24.005(b). The "badges of fraud" include whether:

(1)   the transfer or obligation was to an insider;

(2)   the debtor retained possession or control of the property transferred after the transfer;

(3)   the transfer or obligation was concealed;

(4)   before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)   the transfer was of substantially all the debtor's assets;

(6)   the debtor absconded;

(7)   the debtor removed or concealed assets;

32

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b). "Evidence of a single 'badge of fraud' does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud." *Janvey*, 487 S.W.3d at 566–67; *see Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 755 (Tex. App.—Fort Worth 2005, pet. denied) (observing that fraudulent intent is deduced from facts and circumstances "the law considers as mere badges of fraud and not fraud per se," so "these must be submitted to the trier of fact, which draws the inferences as to the fairness or fraudulent characterization of the transaction").

Relevant here, the trial court concluded that Lender's actual fraudulent transfer claim under Section 24.005(a)(1) failed because Lender did not "establish by a preponderance of the evidence that HAH's liabilities exceeded its assets or that HAH was generally not paying its debts as they came due at the time HAH transferred $787,230 to Pacifica Harbor." This conclusion relates to the insolvency definitions in Section 24.003:

(a) A debtor is insolvent if the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

TEX. BUS. & COM. CODE § 24.003(a), (b).

Lender argues that the trial court's conclusion is erroneous because Lender did not have to prove HAH's insolvency to show an actual fraudulent transfer. Lender is correct. Insolvency is only one indicia of fraud, and Lender was not required to prove every indicium. *See id.* § 24.005(b); *Janvey*, 487 S.W.3d at 566. But any error in this regard is not dispositive because the trial court also found more broadly that the HAH transfer to Harbor was not an actual fraudulent transfer.

Lender argues the broader finding is also erroneous because the evidence showed that:

- HAH was concerned in December 2016 that it might fail its debt-service-coverage-ratio covenants, enabling Wells Fargo to sweep HAH's cash;

- Three days before the transfer, HAH instructed its bank to turn off the auto debit that enabled Wells Fargo to debit monthly debt service from HAH's operating account, which put the task of paying the March 2017 debt service in HAH's hands;

- HAH failed to pay its March 2017 debt service;

- HAH wanted to ensure the transfer occurred before the default, while the Loan was current;

- The transfer was a partner distribution to an insider because Harbor is an 87.47% owner of HAH, *see* TEX. BUS. & COM. CODE § 24.002(7)(B);

- HAH did not tell Lender about the transfer;

- The transfer occurred shortly before HAH incurred a substantial debt—the acceleration of HAH's debt on April 28, 2017—caused by HAH's default on the Loan one business day after the transfer; and

- HAH did not receive reasonably equivalent value for the transfer.

While this may be some evidence that the transfer was fraudulent in character, implicating some "badges of fraud," there was other evidence that supported the opposite conclusion. As noted by HAH and Harbor, the trial court heard evidence that the transfer was a partner distribution, like distributions HAH made monthly in the past before postponing them to save for the upcoming PIP. There was also evidence that HAH wanted to keep the Property and intended to work out an agreement to continue making payments, which supported an inference that the transfer was not actually intended to defraud Lender. Israni testified that HAH had sufficient funds to pay the March 2017 debt service—due only one business day after the transfer—but made a strategic decision not to pay to allow "a conversation with the lender and get the loan restructured." He also testified that from April through August 2017, HAH and the other entities had the financial ability to fund necessary cash through a capital call.

HAH kept making capital expenditure payments after missing the Loan payment. As late as June 8, 2017, three months after the transfer, HAH and Hosts kept negotiating with IHG for the final PIP design. Israni testified to his belief that,

at all times, HAH had enough money to successfully operate the Property and perform the PIP. Finally, both Israni and Cunningham testified that there was "absolutely" no intent on the part of HAH to "hinder, delay, or defraud" Lender.

Considering the conflicting evidence, we cannot say that Lender conclusively proved that HAH made the transfer to Harbor with the "actual intent to hinder, delay, or defraud" Lender or that the trial court's failure to find that HAH had such intent was so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See* TEX. BUS. & COM. CODE § 24.005(a)(1); *see also In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (in a bench trial, trial court acts as factfinder in assessing credibility of witnesses, weighing evidence, and arriving at fact findings).

We overrule Lender's seventh and eighth issues.

## 2. Constructive fraud

Lender also contends the HAH transfer was constructively fraudulent. A claim that a transfer was constructively fraudulent does not require proof that the debtor actually intended to hinder, delay, or defraud a creditor. *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 178 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Under Section 24.006(a), HAH's transfer was constructively fraudulent if (1) Lender was HAH's creditor at the time, (2) HAH did not receive a reasonably equivalent value in exchange for the transfer, and (3) HAH was insolvent at the time or became

36

insolvent because of the transfer. *See* TEX. BUS. & COM. CODE § 24.006(a). To show insolvency, Lender had to prove that the sum of HAH's "debts [was] greater than all of [its] assets at a fair valuation" or that HAH was "generally not paying [its] debts as they became due." TEX. BUS. & COM. CODE § 24.003(a)–(b). TUFTA frames the latter inquiry as a presumption that "a debtor who is generally not paying [its] debts as they become due" is insolvent.

According to Lender, the undisputed fact that HAH defaulted on the Loan by failing to pay the March 2017 debt service is enough to show that HAH failed to pay a debt when it became due and thus was actually or imminently insolvent for purposes of constructive fraud under TUFTA. Although they acknowledge that "***generally*** not paying the debtor's debts as they become due creates a presumption of insolvency," HAH and Harbor assert that a "failure to pay a single debt when it is due does not establish insolvency as a matter of law."

In support, HAH and Harbor rely on *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377 (5th Cir. 2017). In *Janvey*, the Fifth Circuit observed:

> The question of insolvency is to be determined as of the time of the conveyance. Various factors are relevant to determine whether a debtor's payment of its debts shows insolvency. Among them are the number and amount of the unpaid debts in relation to the size of the debtor's operation; the age and number of unpaid debts; the total amount of indebtedness; and the number of unpaid creditors[.]

*Id.* at 387 (internal citations and quotations omitted). And it concluded that the evidence there did not compel the jury to find that the debtor was insolvent at the

time of the allegedly fraudulent transfer. *Id.* at 387–88. The jury heard evidence from which it could infer that the debtor was generally paying its debts as they came due. Other than bills owed to the creditor, the evidence did not identify any other bills that were owed and unpaid. *Id.* As for the creditor's debt, the jury heard conflicting evidence on the debtor's payment history—there was evidence indicating that the debtor (1) was a slow-payer, (2) timely paid its bills, (3) had made substantial payments to its largest creditor. *Id.* at 383, 387–88.

Lender correctly points out that there are distinguishable facts here—namely, that the creditor in *Janvey* was not a mortgagee holding more than 95% of the claims against the debtor and that HAH ceased entirely paying the Loan beginning with the March debt service. But other facts minimize the importance of those distinctions. For instance, at the time of HAH's transfer to Harbor, only one Loan payment had been missed and the Loan had not yet been accelerated. HAH presented evidence that its decision not to make the March payment was strategic—to trigger a renegotiation of the Loan Agreement's terms—and not because of an inability to pay. The evidence also suggested that HAH could make a capital call if additional funds were needed to pay the debt service. HAH otherwise had a good payment history and, as the trial court found, was generally paying its other debts as they came due. We thus cannot say that Lender conclusively proved that HAH was insolvent at the time or became insolvent because of the transfer, as required under

TUFTA. *See* TEX. BUS. & COM. CODE § 24.006(a); *see also In re J.M.T.*, 519 S.W.3d at 267. Nor can we say that the trial court's refusal to find constructive fraud under TUFTA was against the great weight and preponderance of the evidence.

We overrule Lender's ninth issue.

## C.  Breach of Loan Agreement based on Mold and commitment of waste

Despite its general nonrecourse nature, the Loan Agreement made HAH and Hosts jointly and severally liable for "Losses" due to (1) "any act of actual waste" by HAH or Hosts, and (2) "the breach of any representation, warranty, covenant or indemnification set forth in Article 12 [of the Loan Agreement] . . . or in any other Loan Document concerning environmental laws[.]" Article 12, Section 12.2 of the Loan Agreement required HAH to (1) keep the Property free of Mold unless it was "not in a condition, location, or of a type which may pose a risk to human health or safety or the environment or which may result in damage to or would adversely affect or impair the value or marketability of the Property" and (2) "use commercially reasonable efforts" to do so. Any failure by HAH to perform these obligations is "bad faith waste."

Lender sought to hold HAH and Hosts liable for repair and remediation costs under a waste theory based on allegations that HAH did not keep the Property free of Mold. Lender argues, in its tenth through thirteenth issues, that the trial court erred in rejecting these breach-of-contract claims because the evidence conclusively

established each element of the claims. Alternatively, Lender contends that the trial court's no-breach findings and failure to find breaches are against the overwhelming weight of the evidence.

### 1. There is not conclusive or overwhelming evidence of Mold

As to Mold on the Property, the trial court found: (1) "HAH used commercially reasonable efforts to manage mold," and (2) Lender "failed to establish by a preponderance of the evidence that any mold at the Property at any point was 'Mold,' as defined in the Loan." Lender says these findings must be set aside because conclusive evidence, or the great weight and preponderance of the evidence, showed the Property "suffered from extensive Mold infestation" and HAH failed to "commit the resources necessary to diagnose and rectify the spread of Mold."

It is undisputed the Property suffered from mold. But whether the mold met the contractual definition of Mold to create liability under the Loan Agreement and whether HAH and Host used commercially reasonable efforts to combat it was hotly contested. In Lender's view, the testimony and exhibits showed that, "beginning in August 2015 and for two years, HAH ignored consultants and its own employees, allowing mold to proliferate and building systems to decay." Specifically, Lender points to:

- Madden's email correspondence with Israni and others, in March 2015, expressing concern that the renovation of the Property during the initial PIP would not inhibit mold and mildew issues if the HVAC issues were not addressed.

- Madden's testimony that he emailed Israni and others in November 2015 about replacing five roof-top air handlers but the work was not authorized during his tenure as general manager.

- The August 2015 Terracon Report recommending 30 items to address faulty HVAC and other mechanical systems and Madden's testimony that he knew of only two recommendations that were adopted from the Terracon report—replacement of the HVAC systems for a ballroom and a restaurant at the Property.

- HAH's failure to obtain mold-clearance certificates showing that the mold's underlying cause was diagnosed and remediated.

- Testimony from the Property's chief engineer that, after HAH spent $800,000 in 2015 to remediate mold in some hallways and guestrooms, mold persisted.

- The chief engineer's testimony that HAH used in-house employees to clean the mold instead of outside contractors.

- The MI&T report stating that the mold problem "requires contracting a restoration company for professional remediation," and that "[i]t is imperative that any source of water intrusion be addressed to ensure mold growth does not return."

- Testimony that when Cuce took over as receiver in August 2017, 23 PTAC units were missing, 25-40 rooms were unrentable from mold, 38 roof-top air-conditioning units were not fully operational, and the Property suffered from water intrusion.

- Photographs of mold on the Property taken 15 days after Cuce took over.

- Expert testimony from (1) F. McEwen that the Property's mold was not typical, (2) Daniele that a reasonably prudent hotel owner would not have allowed mold to develop as HAH and Hosts had, and (3) Jaeger

41

that the costs to remediate mold and rectify deferred maintenance reduce a hotel's value.

Even if, as Lender asserts, this is some evidence of Mold that could impair the value and marketability of the Property and a lack of effort on HAH's part to resolve it, we cannot say the evidence is conclusive or even overwhelming, as the standard of review requires. *See Huang*, 209 S.W.3d at 677–78. The trial court heard conflicting evidence about how many rooms were out of order because of missing FF&E or mold or mildew or both when Cuce assumed control of the Property. In addition, there was evidence that HAH and Hosts spent $2.6 million to address the Property's condition between January 1, 2014 and August 21, 2017. Specifically, there was evidence that:

- The Property had preexisting mold issues when HAH purchased it, which HAH addressed as part of the initial renovation in 2008.

- HAH chose building materials to minimize the mold both for the initial renovation and again in 2015.

- Madden was always looking for a solution to the mold problem, but the root cause was not discovered.

- HAH continued "fighting" the mold, with Israni testifying that he was committed to "work[ing] hard to take the necessary action to correct the mold/mildew issues."

- While HAH and Hosts continued to look for—but did not find—the source of the mold issues, they sought to combat the mold with in-house personnel treating the rooms that had mold, through an $800,000 hallway mold remediation in 2015.

- HAH bought 300 new PTAC units between 2010 and early 2017.

42

- HAH retained COIT to clean the PTAC units on an ongoing basis.

- HAH caulked windows to mitigate moisture.

- HAH installed 50-pint dehumidifiers throughout the Property.

- HAH engaged licensed environmental-testing and mold-remediation firms to conduct air-quality tests, develop a remediation protocol, and remediate mold from Fall 2014 through 2015.

- The Property was well ranked among Houston-area hotels.

- No other professional mold remediation was done from the time the receivership began in August 2017 until foreclosure in July 2018.

In short, there was disputed evidence about whether HAH maintained the Property in a similar condition to others in a hot and humid climate, HAH's in-house efforts to combat the mold were sufficient, HAH and Hosts ignored the observations and recommendations of its employees and outside consultants, and HAH and Hosts should have explored the cause of the mold further to remediate it more effectively. Under the standard for sufficiency review, the trial court had discretion to believe or disbelieve Lender's evidence and assess the weight and credibility of the evidence. *See, e.g.*, *In re J.P.*, 526 S.W.3d 770, 778 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("In a bench trial, . . . the trial judge is in the best position to observe and assess the witnesses' demeanor and credibility, to sense the forces, powers, and influences that may not be apparent from reading the record on appeal."). Considering the deference we must give the trial court's resolution of underlying facts and credibility determinations, we hold the evidence is legally and factually sufficient to support

the trial court's findings rejecting Lender's claim that HAH breached the Loan Agreement by failing to keep the Property free of Mold and failing to use commercially reasonable efforts to do so.

We overrule Lender's tenth and eleventh issues.

### 2.     There is not conclusive or overwhelming evidence of waste

Lender also sought damages for waste under Section 15.1 of the Loan Agreement, which allows for recovery of "Losses due to . . . any act of actual waste or arson by [HAH]." The trial court concluded that Lender did not prove by a preponderance of the evidence that HAH or Hosts committed an act of actual waste and that "HAH used commercially reasonable efforts to . . . repair, maintain, and replace mechanical systems in the Property."

Neither "waste" nor "an act of actual waste" is defined in the Loan Agreement, and there is no indication the parties intended a technical or specialized meaning. In rejecting Lender's breach of contract claim based on waste, the trial court looked to the common law. While the rules of interpretation require that the contracting parties' intent be determined from the language included in their contract, and not by unexpressed definitions, "[s]ometimes contracts include terms that have common law significance." *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "A term's common-law meaning will not override the definition given to a contractual term by the

44

contracting parties." *Id.* (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217–19 (Tex. 2003)). But we may consider common law rules to "fill in gaps." *Id.* There are gaps.

To establish a claim of waste, a party must show an injury to the reversionary interest in land caused by the wrongful act of a tenant or other party rightfully in possession. *See R.C. Bowen Est. v. Continental Trailways*, 256 S.W.2d 71, 72 (Tex. 1953); *King's Ct. Racquetball v. Dawkins*, 62 S.W.3d 229, 232–33 (Tex. App.—Amarillo 2001, no pet.); *Erickson v. Rocco*, 433 S.W.2d 746, 751 (Tex. App.—Houston [14th Dist.] 1968, pet. denied). "Waste includes injury resulting from failure to exercise reasonable care in preserving the property." *R.C. Bowen Est.*, 256 S.W.2d at 72; *see also* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 4.6(a) (1997) ("Waste occurs when, without the mortgagee's consent, the mortgagor: (1) physically changes the real estate, whether negligently or intentionally, in a manner that reduces its value."). A mortgagee may bring an action for waste when the value of the security is threatened. *Taylor v. Brennan*, 605 S.W.2d 657, 658 (Tex. App.—Houston [1st Dist.] 1980), *rev'd in part on other grounds*, 621 S.W.2d 592 (Tex. 1981); *Brader v. Ellinghausen*, 154 S.W.2d 662, 665 (Tex. Civ. App.—Fort Worth 1941, no writ).

In support of its contention that HAH committed waste by failing to reasonably maintain the Property, Lender cites several cases for the proposition that

waste is shown when a property experienced mold, leaks, or broken and missing appliances. *See, e.g.*, *Wells Fargo Bank, N.A. v. H.B. Regal Parc, LLC*, 383 S.W.3d 253, 256, 258–59 (Tex. App.—Dallas 2012, no pet.) (waste found when property suffered roof leaks and plumbing and electrical issues); *White v. MLMT 2004-BPC1 Carlyle Crossing, LLC*, No. 02-10-00233-CV, 2011 WL 3672022, at *3 (Tex. App.—Fort Worth Aug. 18, 2011, pet. denied) (mem. op.) (waste found when "mold had grown on the walls, carpets, and flooring" of the apartment complex, sheetrock was missing, and air-conditioning units and other appliances were removed from units); *Fath v. CSFB 1999 C-1 Rockhaven Place Ltd. P'ship*, 303 S.W.3d 1, 4, 8 (Tex. App.—Dallas 2009, pet. denied) (waste found when property suffered mold, water leaks, broken appliances and some units were gutted).

As Lender points out, the trial court made relevant findings that, (1) as early as Summer 2014 and into 2015, the Property experienced "air-quality and mold and mildew issues along with operational problems associated with aged mechanical equipment and systems," and (2) "[t]he item included on [Lender's] deferred maintenance list were original equipment that were beyond their useful life or impacted by normal wear and tear," which seem to support a waste finding or at least call into question the trial court's refusal to find waste. But those findings must be balanced against case law instructing that waste excludes ordinary wear and tear or equipment that has merely reached the end of its useful life or suffered depreciation.

46

*See, e.g.*, *White*, 2011 WL 3672022, at *3 (considering evidence that damage to property was not attributable to ordinary wear in evaluating waste claim); *Hill v. Jarvis*, No. 12-07-00091-CV, 2008 WL 2571753, at *3 (Tex. App.—Tyler June 30, 2008, pet. denied) (mem. op.) (acknowledging that "the term 'waste' does not include ordinary depreciation due to age or use"); *Gulf Oil Corp. v. Horton*, 143 S.W.2d 132, 134 (Tex. Civ. App.—Amarillo 1940, no writ) ("The law imposes upon a tenant or lessee the duty to take good care of the premises, wear and tear excepted, and this obligation is implied where not expressly waived whether written into the lease contract or not."); *accord Vogel v. Pardon*, 444 N.W.2d 348, 350 (N.D. 1989) ("[T]he object of an award of damages in an action for waste is to compensate without unjust enrichment."). Given the conflicting evidence of HAH's efforts to maintain the Property and its mechanical equipment and the trial court's discretion as factfinder to weigh that evidence and assess its credibility, *see In re J.P.*, 526 S.W.3d at 778, we cannot say the record conclusively shows waste. Nor can we say that the trial court's failure to find waste was against the great weight and preponderance of the evidence. *See id.*

We overrule Lender's twelfth issue. Given this disposition, we do not reach Lender's thirteenth issue on damages for the waste claim. *See* Tex. R. App. P. 47.1.

47

## IV. Counterclaims

### A.     Declaratory judgment for appellees

In its fourteenth issue, Lender argues that the trial court erred by granting relief on Appellees' declaratory-judgment counterclaim because it merely duplicated the issues raised by Lender. Generally, the Texas Declaratory Judgments Act is not available to settle disputes already pending before a court. *See Hous. Aeronautical Heritage Soc'y, Inc. v. Graves*, No. 01-12-006443-CV, 2013 WL 6506301, at *5 (Tex. App.—Houston [1st Dist.] Dec. 10, 2013, no pet.) (mem. op.) (declaratory judgment statute cannot be relied on to convert all actions into declaratory judgment actions); *Universal Printing Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (same). While this general rule precludes a counterclaim that presents nothing more than a denial of the plaintiff's claim, a counterclaim seeking affirmative relief is allowed. *Graves*, 2013 WL 6506301, at *5 (recognizing possibility that a defensive declaratory judgment may present issues beyond those raised by plaintiff).

Without deciding which side of the rule Appellees' declaratory-judgment counterclaim fell on, we conclude that any error is harmless because the counterclaim did not have any practical effect on the outcome. No attorney's fees were awarded on the declaratory-judgment counterclaim, and Appellees have requested none on appeal. *See Encore Int'l Inv. Funds, LLC v. 2608 Inwood, Ltd.*,

No. 05-19-00070-CV, 2020 WL 1685420, at *3 (Tex. App.—Dallas Apr. 7, 2020,

no pet.) (mem. op.) (concluding that any error in allowing declaratory-judgment

claim was harmless because declarations "added nothing to what would be implicit

in a final judgment on the defenses raised"). Appellees thus received no additional

relief through declaratory judgment beyond what they would have obtained had the

trial court entered a final judgment based only on their defenses, absent the

declarations. *See id.*; *see also* TEX. R. APP. P. 44.1.

We overrule Lender's fourteenth issue.

## B.     Attorney's fees for Harbor

Lender's fifteenth, sixteenth, and seventeenth issues challenge the trial court's

decision to award Harbor attorney's fees for successfully defending against Lender's

TUFTA claim. Lender contends:

(1)     Harbor's live pleading did not request fees under TUFTA;

(2)     Harbor's post-trial motion for judgment, which requested fees under TUFTA for the first time, is not a proper trial amendment;

(3)     only a plaintiff may recover fees under TUFTA;

(4)     the fees award is not equitable or just;

(5)     Harbor's fees evidence exceeded the scope of the expert designation; and

(6)     the amount awarded is not supported by legally or factually sufficient evidence because it includes fees for unrecoverable claims.

49

### 1. Pleading requirement

Generally, in Texas, each party must pay its own attorney's fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483 (Tex. 2019). However, there are certain circumstances in which a party may recover attorney's fees from the opposing party, such as when fee-shifting is authorized by statute or contract. *Id.* at 484. TUFTA authorizes the shifting of attorney's fees in certain situations. Under Section 24.013, the trial court "may award costs and reasonable attorney's fees as are equitable and just." TEX. BUS. & COM. CODE § 24.013. Attorney's fees under this statute are discretionary, not mandatory. *See id.*; *see also Tanguy v. Laux*, No. 01-13-00501-CV, 2015 WL 3908186, at *6–7 (Tex. App.—Houston [1st Dist.] June 25, 2015, pet. denied) (mem. op.) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998)). In the absence of a mandatory statute, a judgment awarding attorney's fees must be supported by proper pleadings or tried by consent. *In re Est. of Gaines*, 262 S.W.3d 50, 60 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

No party argues that Lender tried the issue of Harbor's fees under TUFTA by consent. Instead, the parties' dispute turns on Harbor's pleadings. Harbor's live pleading at trial did not request attorney's fees under TUFTA. Instead, it requested attorney's fees specifically under the Declaratory Judgments Act and generally for "prosecuting" its counterclaim through trial and appeal. *See* TEX. CIV. PRAC. & REM.

CODE § 37.009. Harbor's only counterclaim in the live pleading was for declaratory relief, including declarations that the pre-default cash transfer from HAH was not fraudulent under TUFTA. Harbor requested fees under TUFTA for the first time in a motion for judgment filed seven months after trial. The trial court concluded that the posttrial motion served as a trial amendment and granted it.

Trial amendments are governed by Texas Rule of Civil Procedure 66, which provides that a trial court may allow amendments and shall do so when the amendment would serve the presentation of the merits without prejudicing the opposing party's action or defense on the merits. *See* TEX. R. CIV. P. 66. Under the rule, "[a] trial court has no discretion to refuse a trial amendment unless: (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment is prejudicial on its face because it asserts a new cause of action or defense, and the opposing party objects to the amendment." *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 64 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Trial amendments that are procedural in nature—such as conforming the pleadings to the evidence at trial—must be allowed. *Id.* But substantive amendments—those that change the nature of the trial—are discretionary. *Id.* The trial court's decision to allow or deny them may be reversed only for a clear abuse of discretion. *Id.*; *see also State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994).

51

To determine prejudice, we evaluate a trial amendment in the context of the entire case. *Tanglewood Homes Ass'n*, 436 S.W.3d at 64. An amendment asserting a new cause of action is prejudicial on its face if (1) the amendment asserts a new substantive matter that reshapes the nature of the trial itself; (2) the new matter is of such a nature that the opposing party could not have anticipated the development before the amendment was requested; and (3) the opposing party's presentation of its case would be detrimentally affected by the amendment. *Id.*

Consistent with this scheme, several courts of appeals have allowed a request for attorney's fees made after trial, but before judgment, to serve as a trial amendment when the request did not assert a new cause of action and the opposing party did not present evidence of surprise. *See, e.g.*, *Est. of Wright*, 482 S.W.3d 650, 660–61 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (allowing posttrial, prejudgment filing to serve as trial amendment for fees because party seeking them included request for fees in proper pleadings and opposing party did not allege surprise); *Nisby v. Dentsply Int'l, Inc.*, No. 05-14-00814-CV, 2015 WL 2196627, at *1 (Tex. App.—Dallas May 11, 2015, no pet.) (mem. op.) (holding, without discussing surprise or prejudice, that post-verdict motion for judgment that requested attorney's fees supported fees award); *Good v. Baker*, 339 S.W.3d 260, 267 (Tex. App.—Texarkana 2011, pet. denied) (holding posttrial, prejudgment motion for attorney's fees based on permissive statute was trial amendment supporting fees

award); *Swate v. Medina Cmty. Hosp.*, 966 S.W.2d 693, 701–02 (Tex. App.—San Antonio 1998, pet. denied) (holding post-verdict, prejudgment motion for fees served as trial amendment supporting fees award).

Lender argues that, unlike the appellants in those cases, it proved surprise and prejudice. Relying on this Court's authority characterizing affirmative claims for fees based on "preparation and prosecution of a defense" as counterclaims, *see Bacon Tomsons, Ltd. v. Chrisjo Energy, Inc.*, No. 01-15-00305-CV, 2016 WL 4217254, at *10 (Tex. App.—Houston [1st Dist.] Aug. 9, 2016, no pet.) (mem. op.), Lender asserts that Harbor's posttrial request for TUFTA fees asserted a new cause of action that reshaped the nature of the trial. Lender asserts that it could not anticipate that Harbor would make a claim for TUFTA fees because Harbor had previously limited its fees requests to the Declaratory Judgments Act. And had Lender known Harbor would ask for fees under TUFTA, it might have used a different trial strategy:

> Lender sought just $787,230 in damages in connection with its TUFTA claims, compared to $10 million-plus it sought for its full-recourse claim for HAH's breach of the Solvency Covenants. Because . . . it cannot recover more than the Deficiency, [Lender] may have pursued only its breach-of-contract claims rather than also seeking relief under TUFTA that, if denied, could have warranted the award of attorney's fees against Lender.

(Citations omitted.) Prejudice exists, Lender says, because it lost the opportunity to make that strategic decision.

We conclude that even if Harbor's posttrial motion asserted a new cause of action for fees under TUFTA, the trial court was not required to reject the amendment. *See Kilpatrick*, 874 S.W.2d at 658; *Tanglewood Homes Ass'n*, 435 S.W.3d at 65 ("[A] discretionary trial amendment should not be rejected simply because it alleges a new cause of action."). Considering the context of the entire case, the trial court could reasonably conclude that the trial amendment did not prejudice Lender because it did not reshape the nature of the case. *See Tanglewood Homes Ass'n*, 436 S.W.3d at 65.

Lender knew throughout the trial proceedings that it would have to defend against a fees award to Harbor. Harbor requested fees in each of its pretrial pleadings and designated an expert to testify about its fees. Lender agreed with Harbor to resolve the fees issue after trial. The trial court also could reasonably conclude that Lender could anticipate the trial amendment. *See id.* Although Harbor's pretrial fees requests were under the Declaratory Judgments Act, it sought declarations related to TUFTA. And as explained below, TUFTA gives the trial court broad discretion to award fees based on what it finds is equitable and just. *See* TEX. BUS. & COM. CODE § 24.013. Finally, the fact that the fees issue was resolved on the parties' agreed-upon timeline and did not require Lender to address or rebut any new witnesses could have led the trial court to reasonably conclude the amendment did not detrimentally impact the presentation of Lender's case. *See Tanglewood Homes*

*Ass'n*, 436 S.W.3d at 65. On this record, we cannot say that the trial court abused its discretion by allowing Harbor's posttrial motion for judgment to serve as a trial amendment for TUFTA fees.

### 2. Statutory limitations on fees

Lender also argues that the fees award must be set aside because it does not comply with certain statutory limitations on such awards. Specifically, Lender contends: (1) Harbor cannot recover fees because it is not the intended beneficiary of the TUFTA fees provision and (2) the fees award is not equitable or just.

Lender's first argument rests on the premise that TUFTA does not allow defendants who defeat fraudulent transfer claims to recover fees. Considering TUFTA's purpose "to prevent a debtor from defrauding its creditors by moving assets out of reach," *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 79 (Tex. App.—Houston [1st Dist.] 2012, pet. denied), Lender asserts that the Legislature intended the fees provision "to make successful *plaintiffs* whole by obtaining attorney's fees they incurred in *recovering* fraudulent transfers." (Emphasis in original.) Whether attorney's fees are available under a particular statute depends on statutory construction, which is a question of law we review de novo. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam).

While the overriding goal of statutory construction is to discern the Legislature's intent, we identify that intent by looking to the statute's plain language. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *see also* TEX. GOV'T CODE § 312.005. Section 24.013 of TUFTA provides that, "[i]n any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just." TEX. BUS. & COM. CODE § 24.013. This Court has interpreted Section 24.013 as giving the trial court discretion to award fees or not. *See Tanguy v. Laux*, No. 01-13-00501-CV, 2015 WL 3908186, at *6–7 (Tex. App.—Houston [1st Dist.] June 25, 2015, pet. denied) (mem. op.). Considering the statute's plain language, we do not agree with Lender that the trial court's discretion to award fees is limited to plaintiffs.

Unlike other statutes, TUFTA does not use words requiring or limiting an award of fees to a particular party. *Compare* TEX. BUS. & COM. CODE § 24.013, *with id.* § 17.50(d) ("Each consumer who prevails shall be awarded court costs and reasonable and necessary attorney's fees."); TEX. CIV. PRAC. & REM. CODE § 38.001(b) ("A person may recover reasonable attorney's fees from an individual or organization other than a quasi-governmental entity authorized to perform a function by state law . . . ."); TEX. ELEC. CODE § 253.131(e) ("Reasonable attorney's fees incurred in the suit may be awarded to the defendant if judgment is rendered in

56

the defendant's favor."). That is, TUFTA does not say that a specific *party* "may recover," "shall be awarded," or "is entitled to" attorney's fees. *See* TEX. BUS. & COM. CODE § 24.013. It says only that "the *court* may" award fees. *See id.* (emphasis added). We will not add words to the statute. *See ExxonMobil v. Coleman*, 512 S.W.3d 895, 900–01 (Tex. 2017) (instructing that "[a] court may not judicially amend a statute by adding words that are not contained in the language of the statute" and must instead "apply the statute as written").

In *Bocquet v. Herring*, the Texas Supreme Court considered nearly identical language in the Declaratory Judgments Act providing that "the court may award costs and reasonable and necessary attorney's fees as are equitable and just."[12] *See* 972 S.W.2d 19, 20–21 (Tex. 1998) (construing TEX. CIV. PRAC. & REM. CODE § 37.009). The Court explained that the statute "does not require an award of attorney fees to the prevailing party," but instead "affords the trial court a measure of discretion in deciding whether to award attorney fees or not." *Id.* at 20 (noting "[t]he same is true of other statutes that provide a court 'may' award attorney's fees"). The Declaratory Judgments Act limits the trial court's discretion only as to

---

[12]    The only difference is that the Declaratory Judgments Act references "reasonable *and necessary* attorney's fees" whereas TUFTA references only "reasonable attorney's fees." *Compare* TEX. CIV. PRAC. & REM. CODE § 37.009, *with* TEX. BUS. & COM. CODE § 24.013.

57

the requirements that any fees awarded are reasonable and necessary, which are matters of fact, and equitable and just, which are matters of law. *Id.*

We conclude the same is true under TUFTA as to the reasonableness, equity, and justice of fees awards. *See Tanguy*, 2015 WL 3908186, at *7 (considering whether trial court abused its discretion by awarding fees under TUFTA without sufficient evidence that fees were reasonable or by awarding fees that were inequitable or unjust"). And we decline to adopt an interpretation of Section 24.013 that limits the trial court's discretion further by authorizing fees only for prevailing plaintiffs and not prevailing defendants. *Cf. Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 393 (5th Cir. 2017) (referring to parties eligible for fees under TUFTA as "prevailing plaintiffs" or "prevailing defendants"); *Cypers v. Bankcard Cent., LLC*, No. 4:21-cv-00382, 2024 WL 1257482, at *2 (E.D. Tex. Mar. 25, 2004) (mem. order) (describing TUFTA's fees provision as allowing recovery by parties who "either successfully bring or defend a TUFTA claim").

Lender's second argument—that the trial court erred by answering the legal question of equity and justice in Harbor's favor—rests on a multi-factor test from a federal case. *See Janvey*, 856 F.3d at 393. In *Janvey*, the federal appeals court found a number of factors "relevant to determining whether a fee award is 'equitable and just' under TUFTA, including: (1) whether the case involved egregious conduct; (2) whether an award of fees accomplishes the goals of TUFTA; (3) the evidence

heard by the trial court; and (4) 'evidence of bad faith, vexation, wantonness, oppression, or harassment relating to the filing or the maintenance of this action[.]'" *Id.* (citations omitted). The court derived the factors from various authorities, primarily bankruptcy cases. *See id.* (citing bankruptcy cases for first, second, and fourth factors). Only one Texas case is cited. *See id.* (citing *Citizens Nat'l Bank of Tex.*, 387 S.W.3d at 87, in support of the third factor looking to "the evidence heard by the trial court"). And notably, the Texas Supreme Court has not adopted the *Janvey* factors.[13]

As an intermediate court of appeals, we decline to adopt a new standard for determining whether an award of fees is "equitable and just" under Section 24.013. Instead, we look again to the Texas Supreme Court's guidance under the Declaratory Judgments Act. *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (to determine common, ordinary meaning of statutory language, courts look to "a wide variety of sources, including, . . . the uses and definitions of the word in other statutes"). In that context, whether it is "equitable and just" to award attorney's fees depends not on direct proof, but on the concept of fairness, considering all the circumstances of the case. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162

---

[13] We found only one Texas court—the Dallas Court of Appeals—that cited the *Janvey* factors, but that court never applied them. *See Porter v. Summitbridge Nat'l Invs. III LLC*, No. 05-19-01052-CV, 2020 WL 4815049, at *6 (Tex. App.—Dallas Aug. 19, 2020, no pet.) (mem. op.).

(Tex. 2004); *see also Bocquet*, 972 S.W.2d at 21 ("Matters of equity are addressed to the trial court's discretion. So is the responsibility for just decisions." (citations omitted)). Because nothing in the record makes the trial court's finding that equity and justice favored an award of reasonable fees to Harbor arbitrary or unreasonable, we cannot conclude that the trial court erred. *See id.*; *Bocquet*, 972 S.W.2d at 20–21.

### 3. Fees expert designation

Lender argues that there is legally insufficient evidence to support the fees award because Harbor's expert was designated only for fees "incurred by [Appellees] in prosecuting any counterclaims in this lawsuit," not for fees incurred in defending Lender's claims.

Under the Texas Rules of Appellate Procedure, Lender's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). While Lender cites the relevant materials in the appellate record, it offers no legal authority for its contention beyond a general citation to case law requiring attorney's fees awards to be supported by expert testimony. *See Brown v. Traylor*, 210 S.W.3d 648, 658 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (considering defendant's argument that neither plaintiff's testimony nor fee statements admitted into evidence could substitute for expert testimony proving up amount of fees). This citation does not address Lender's complaint that Harbor's fees expert was not properly designated.

Lender clarifies in a reply brief footnote that it is complaining under the "fundamental" rule that "an improperly designated expert must be stricken," citing Texas Rule of Civil Procedure 193.6. But neither of Lender's briefs addresses Rule 193.6's standard for exclusion of evidence.[14] *See* TEX. R. CIV. P. 193.6 (testimony from witness who is not timely identified must be excluded unless court finds "(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties"). When an appellate issue is unsupported by argument, nothing is presented for our review. *See Guimaraes v. Brann*, 562 S.W.3d 521, 538 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Valadez v. Avita*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.).

#### 4. Amount of attorney's fees

Lender also argues that the trial court erred in awarding attorney's fees to Harbor because Harbor did not meet its burden to prove the amount of recoverable fees.[15] Again, each party must pay its own attorney's fees unless a statute or contract

---

[14] Lender has discussed surprise and prejudice as to the trial amendment allowing Harbor to request fees under TUFTA under TEX. R. CIV. P. 66, but not as to Harbor's fees expert under TEX. R. CIV. P. 193.6.

[15] We note Harbor's argument that Lender waived this issue by objecting only generally to a lack of fee segregation. We find Lender's objections that Harbor failed to segregate the fees it incurred for defending the "TUFTA claims and insolvency issues at the time of [the allegedly fraudulent transfer]" from HAH's insolvency "at

authorizes fee-shifting. *Rohrmoos Venture*, 578 S.W.3d at 483–84. When fee-shifting is authorized, the factfinder must determine the reasonable hours worked multiplied by a reasonable hourly rate. *Id.* at 498. We presume this base lodestar calculation is the reasonable and necessary amount of attorney's fees to be shifted to the opposing party, so long as the amount is supported by sufficient evidence. *Id.* at 499. Sufficient evidence includes evidence of "(1) particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing such services." *Id.* at 498.

The fee claimant bears the burden of proving the reasonableness of the amount awarded. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762–64 (Tex. 2012). If the opposing party wants to reduce the amount of attorney's fees awarded, that party must provide specific evidence to overcome the presumption of reasonableness. *Rohrmoos Venture*, 578 S.W.3d at 501.

Because attorney's fees are recoverable only when authorized by statute or contract, a fee claimant must segregate attorney's fees that are recoverable from

---

other periods" is sufficiently specific to preserve the issue for appellate review. *Cf. Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991) (holding that the following objection was sufficient to preserve error: "[T]here has been no breakdown or allocation . . . of the fees incurred in connection with this defendant, as well as numerous other defendants, in order to show what is allocable as a reasonable amount for the prosecution of the suit against this defendant" (emphasis omitted)).

those that are not. *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). When a lawsuit involves multiple parties, the fee claimant must also "segregate recoverable fees from those incurred by parties or on claims for which fees are not recoverable." *Clearview Props., L.P. v. Prop. Tex. SC One Corp.*, 287 S.W.3d 132, 143 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also French v. Moore*, 169 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("A party seeking attorney fees has a duty to segregate nonrecoverable fees from recoverable fees, and to segregate the fees owed by different parties.").

An exception to the rule on segregation exists "when the services for which the fees are incurred 'advance both a recoverable and unrecoverable claim,' such that the 'fees are so intertwined that they need not be segregated.'" *Transcor Astra Grp. S.A. v. Petrobras Am., Inc.*, 650 S.W.3d 462, 482–83 (Tex. 2022) (quoting *Chapa*, 212 S.W.3d at 313–14). But intertwined facts do not make otherwise unrecoverable fees recoverable. *Chapa*, 212 S.W.3d at 313–14. "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.*

In making this determination, "we do not look at the legal work as a whole but parse the work into component tasks, such as examining a pleading paragraph by paragraph to determine which ones relate to recoverable claims." *Clearview*

*Props.*, 287 S.W.3d at 144; *see Chapa*, 212 S.W.3d at 313 (stating that when plaintiff's attorneys were "drafting [plaintiff's] pleadings or the jury charge relating to fraud, there is no question those fees were not recoverable"). Unrecoverable fees are not rendered recoverable "merely because they are nominal." *Chapa*, 212 S.W.3d at 313. The party seeking recovery of attorney's fees must show that segregation is not required. *Sustainable Tex. Oyster Res. Mgmt., L.L.C. v. Hannah Reef, Inc.*, 623 S.W.3d 851, 872 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

The need to segregate attorney's fees is a question of law, and the extent to which claims can or cannot be segregated is a mixed question of law and fact. *Chapa*, 212 S.W.3d at 312–13 ("how hard something was to discover and prove, how strongly it supported particular inferences or conclusions, how much difference it might make to the verdict, and a host of other details that include judgment and credibility questions about who had to do what and what it was worth" may render extent to which certain claims are subject to segregation a mixed question of law and fact). When a fee claimant fails to properly segregate attorney's fees, we may remand the issue to the trial court for reconsideration. *Kinsel*, 526 S.W.3d at 428; *Chapa*, 212 S.W.3d at 314.

Several things are not disputed here. There is no dispute that only one claim allowed for the recovery of attorney's fees: the TUFTA claim against Harbor. *See* TEX. BUS. & COM. CODE § 24.013. There is no dispute that the fees for the claims

64

against HAH and Hosts were not recoverable and that the fees for those claims should have been segregated from the fees for the TUFTA claims to the extent possible. And there is no dispute that Harbor segregated some fees. The dispute is whether Harbor adequately segregated its attorney's fees. Lender contends Harbor did not adequately segregate the recoverable and the unrecoverable attorney's fees, making the amount awarded unreasonable. Harbor responds that it segregated the fees that could be segregated, but the rest could not be segregated because they were for legal services that advanced both recoverable and unrecoverable claims.

The same counsel represented all three Appellees. By affidavit, counsel testified that he was engaged to represent HAH, Hosts, and Harbor in February 2019, more than a year after HAH and Hosts were sued by Lender and about two months after Lender amended its petition to include the TUFTA claims against Harbor. Appellees incurred $1,778,314.50 in fees to defend "the entirety of [Lender's] suit," $318,565.35 (or about 18%) of which counsel attributed to the defense of Lender's TUFTA claims. Counsel explained that the fees requested by Harbor for defense of the TUFTA claim included those for the legal services he and other attorneys performed to defend against Lender's allegation that HAH was insolvent. According to counsel,

> To prevail on its fraudulent transfer claims, . . . [Lender had] to prove that HAH made the transfers when it was insolvent or when it reasonably should have believed it would incur debts that could not be paid when they became due. . . . [Lender] also had to prove HAH's

insolvency to prevail on its full recourse claim under the Loan. As a result, attorneys' fees expended on the insolvency issue necessarily advanced [Appellees'] successful defense of both the TUFTA claims and the full recourse claim under the Loan.

He set out the TUFTA-related fees in a table organized by category and description of work, hours worked, and hourly rate. Counsel stated his opinion that the rates were reasonable. And he attached to his affidavit redacted billing records detailing dates, hours spent, hourly rate, and narrative description of the legal services that advanced the TUFTA defense.

The trial court agreed with counsel and concluded that the fees incurred in defending the allegation that HAH was insolvent advanced both the defense of the TUFTA claims, for which fees were recoverable, and the defense of Lender's full recourse claim under the Loan Agreement, for which fees were not recoverable. And thus, Harbor did not have to "segregate attorney's fees relating to insolvency between those claims." The trial court awarded Harbor all the trial fees it requested.

Lender argues that the amount awarded was not reasonable because, although Harbor segregated some unrecoverable fees, it did not segregate all unrecoverable fees. In support, Lender asserts that insolvency was "a common element of proof" for the full recourse and TUFTA claims only as to HAH's status in March 2017, when the alleged fraudulent transfer occurred. *See* TEX. BUS. & COM. CODE § 24.006(a) (requiring proof that "debtor was insolvent at the time [of the transfer] or . . . became insolvent as a result of the transfer or obligation"). By failing to limit

the award to the fees related to defending HAH's solvency around the time of the transfer, Lender says, the trial court awarded fees for unrecoverable claims.

We agree with Lender that at least some of the work performed by counsel related solely to unrecoverable claims. For example, Harbor requested fees to prepare cross-examination of Lender's valuation expert Jaeger. Jaeger opined on the value of the Property in July 2018—more than 16 months after the alleged fraudulent transfer—and whether costs to remediate mold and address deferred maintenance reduced a hotel's value. The value of the Property in July 2018 is unrelated to the question of HAH's solvency in March 2017. Harbor responds that counsel's preparation of Jaeger's cross-examination advanced the defense of the TUFTA claim because "the trial court struck Lender's untimely solvency expert before trial," Lender tried to get around that ruling through the testimony of its other experts, and Harbor needed to be ready to prevent the other experts, including Jaeger, from testifying beyond their designations. But the example Harbor gives in support of this concern relates to the reasonableness of PIP costs included in the July 2018 appraisal. This unrecoverable fee should have been segregated from the recoverable fees.[16] *See Sustainable Tex. Oyster Res. Mgmt.*, 623 S.W.3d at 873 ("If any of the component tasks relate solely to a cause of action for which legal fees are not

---

[16] We are not suggesting that there are no additional attorney's fees that may need to be segregated. We are using the unrecoverable fees incurred in preparing cross-examination only as an example.

recoverable, the claimant must segregate the fees."); *see also Hillegeist Fam. Enters., LLP v. Hillegeist*, 667 S.W.3d 349, 359–60 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (party opposing fee award overcame presumptive reasonableness of fee claimant's base lodestar figure where fee claimant attempted to reduce incurred fees by select units of time for unrecoverable but unrecoverable fees remained).

Still, Harbor provided at least some evidence of the amount of fees it should be awarded. *See Chapa*, 212 S.W.3d at 314 ("Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be."). Its failure to segregate some unrecoverable attorney's fees does not preclude a recovery of attorney's fees. *Kinsel*, 526 S.W.3d at 428. The appropriate remedy is to remand the issue to the trial court "for reconsideration with sufficiently detailed information for a meaningful review of the fees sought." *Id.*

We therefore sustain Lender's complaint that Harbor failed to adequately segregate its attorney's fees. We overrule the rest of the complaints in Lender's fifteenth, sixteenth, and seventeenth issues on attorney's fees.

## V. Conclusion

We reverse the portion of the trial court's judgment awarding attorney's fees to Harbor, affirm the remainder of the judgment, and remand the case to the trial court for a new trial limited to the issue of Harbor's reasonable attorney's fees. *See* TEX. BUS. & COM. CODE § 24.013; *see also Sustainable Oyster Res. Mgmt.*, 623

68

S.W.3d at 876 (reversing portion of judgment awarding attorney's fees based on failure to segregate, affirming remainder of judgment, and remanding for new trial limited to issue of attorney's fees); *Getty v. Perryman*, No. 14-17-00887-CV, 2019 WL 1768604, at *6 (Tex. App.—Houston [14th Dist.] Apr. 23, 2019, no pet.) (mem. op.) (same).

Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.